**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS – EASTERN DIVISION**

| | |
|---|---|
| **JAMES BARNES, PHILLIP WHITEHEAD, WALTER CLARK, DAVID BISHOP and ERIC LISH, individually and on behalf of all others similarly situated,** ) ) ) ) ) | **Case No. 1:13-cv-6243** |
| **Plaintiffs,** ) ) | **Hon. Gary Feinerman** |
| **v.** ) ) | |
| **AIR LINE PILOTS ASSOCIATION, INTERNATIONAL,** ) ) ) | |
| **Defendant.** | |

## AMENDED COMPLAINT

Plaintiffs James Barnes, Phillip Whitehead, Walter Clark, David Bishop and Eric Lish (collectively, "Plaintiffs"), on behalf of themselves and all others similarly situated, bring this action against defendant Air Line Pilots Association, International ("ALPA" or "Defendant") for unlawfully depriving them of millions of dollars of retroactive pay in breach of the union's duty of fair representation under the Railway Labor Act, 45 U.S.C. § 151 *et seq.* For their amended complaint, Plaintiffs state as follows upon personal knowledge as to those matters pertaining to them individually and upon information and belief as to the remaining allegations:

### SUMMARY OF CLAIMS

1. In August of 2010, the recently formed United Continental Holdings, Inc. ("United" or the "Company") began negotiating with ALPA to reach a new unified contract with its Continental and United pilots, whose two previous, separate contracts had expired – or, more precisely, become amendable – under the Railway Labor Act over the preceding year and a half. Negotiations lasted an additional two and a half years, until December 18, 2012, when the parties agreed on a new contract.

2. As the final part of the negotiations, ALPA insisted on behalf of its pilot members that the agreement include retroactive – or "retro" – pay to compensate *all* of the airlines' pilots for what they had lost by operation of the multi-year delay following the amendable dates of their previous contracts, during which time the pilots' salaries were effectively frozen. The Company ended this aspect of the dispute by agreeing to pay $400 Million to finalize the 2012 contract, assigning to ALPA the responsibility for distributing the lump sum among all of the pilots. An intra-union arbitration divided the money between the two airlines' pilot groups: $225 Million for the United Pilots and $175 Million for the Continental Pilots.

3. While $225 Million was insufficient to provide full retroactive pay for all of the United Pilots, ALPA had a duty to apportion that money in a manner that would fairly reflect, on a *pro rata* basis, the additional amounts that each United Pilot would have earned over the previous three years had the pay increases in the 2012 contract been in place as of the amendable date of the previous United contract (the "Retro Pay Period"). Instead, however, ALPA devised a methodology that unfairly and arbitrarily discriminated against a minority of its members by, among other things, arbitrarily off-setting certain portions of their compensation from the retro pay to which they were entitled, using a lower number of credit hours for certain pilots than what was actually earned during the Retro Pay Period and even excluding certain credit hours all together. As a result, these minority groups were deprived of millions of dollars in retro pay to which they were entitled, money that instead went to the more powerful majority group, as well as to the very ALPA representatives who decided how to apportion the $225 Million lump sum.

## THE PARTIES

4. Plaintiff James Barnes ("Barnes") is a citizen of the United States and a resident of Colorado. Barnes is and has been a United pilot and dues-paying member of ALPA since

2

1985.

5.     Plaintiff Phillip Whitehead ("Whitehead") is a citizen of the United States and a resident of Colorado.  Whitehead was a United pilot and dues-paying member of ALPA from 1979 until May of 2013, at which time he retired.

6.     Plaintiff Walter Clark ("Clark") is a citizen of the United States and a resident of Georgia.  Clark was a United pilot and dues-paying member of ALPA from 1989 until 2013, at which time he retired from the United pilot seniority list.

7.     Plaintiff David Bishop ("Bishop") is a citizen of the United States and a resident of Colorado.  Bishop is and has been a United pilot and dues-paying member of ALPA since the late 1990's.

8.     Plaintiff Eric Lish ("Lish") is a citizen of the United States and a resident of Colorado.  Lish is and has been a United pilot and dues-paying member of ALPA since the late 1990's.

9.     Defendant ALPA is a national labor union and was at all relevant times the certified collective bargaining representative under the Act for Plaintiffs and the members of the classes.

## JURISDICTION AND VENUE

10.     This Court has jurisdiction over this action pursuant to 28 U.S.C. §§ 1331, 1367 and 1337 in that the claims alleged arise under the laws of the United States and Acts of Congress regulating commerce, specifically the Railway Labor Act, 45 U.S.C. § 151 *et seq.*, and supplemental jurisdiction is appropriate over all other claims in that they are so related to claims in the action within such original jurisdiction that they form part of the same case or controversy under Article III of the United States Constitution.

11.     Venue is proper in this Court under 28 U.S.C. § 1391(b) because the Defendant resides, maintains offices, and does business in this judicial district and because a substantial part of the events giving rise to Plaintiffs' claims arose in this district.

## FACTUAL ALLEGATIONS

12.     For nine years, United Airlines' pilots worked under a concessionary collective bargaining agreement negotiated for them by ALPA in 2003 during United Airline's bankruptcy, which agreement included significant wage reductions and cuts to benefits.  Although that agreement's term ended on January 1, 2010, the Railway Labor Act (the "Act") required the pilots to continue working as if that agreement were still in force until a new contract could be negotiated and put in place.[1]

13.     Negotiations began in 2010 and lasted nearly three years.  In the interim, United Airlines merged with Continental Airlines to form United Continental Holdings, Inc. ("United" or the "Company").  However, for the merged company's internal purposes and for all purposes relevant herein, the pilots of the two airlines remained separate groups (referred to hereinafter as the "United Pilots" and the "Continental Pilots," respectively).[2]  The Continental Pilots had also been working under a lapsed contract for several years.  Finally, at the end of 2012, ALPA and United agreed on a new contract for both groups of pilots (the "2012 United Pilot Agreement" or the "2012 UPA").

14.     As a final part of the negotiations, and at the insistence of both groups of pilots generally, ALPA demanded that the 2012 UPA include retroactive – or "retro" – pay to

---

[1] Under the Act, pilots' collective bargaining agreements do not expire, but rather become "amendable," after which time the pilots continue working under the amendable contract until a new contract can be negotiated and executed.

[2] Internally, United now refers to the two groups as "Legacy United Airlines pilots" (or L-UAL pilots) and "Legacy Continental Airlines pilots" (or L-CAL pilots).

compensate the pilots for what they had lost by operation of the delay in reaching the new agreement, during which time the United Pilots' salaries had been effectively frozen under the pay scale set forth in the concessionary 2003 bankruptcy contract.

15. Indeed, the United Pilots had worked during those years with the understanding from ALPA that the union was negotiating for them, not only a new contract, but also the retro pay necessary to put each of them in the financial position he or she would have occupied had the new contract (*i.e.,* the 2012 UPA) been consummated on January 1, 2010. This goal was commonly referred to during negotiations as "100% retro pay" for all of ALPA's United Pilots. In fact, ALPA engaged in a dialogue with the United Pilots during negotiations and acknowledged that although compromise would be necessary, the goal was to secure for each pilot as much as possible of what he or she would receive "[g]oing back to the amendable date with Date of Signing (DOS) rates."

16. United ultimately agreed to pay $400 Million to settle ALPA's demand for retro pay and so to finalize the 2012 United Pilot Agreement. ALPA accepted the $400 Million in order to provide as much of "100% retro pay" as possible to both groups of pilots. An intra-union arbitration divided the money between the two groups of pilots: $225 Million for the United Pilots and $175 Million for the Continental Pilots.

17. While the $225 Million was far less than was needed to provide the approximately 6,000 United Pilots with "100% retro pay," the union was thus nonetheless duty bound to apportion that settlement amount according to each pilot's *pro rata* losses for continuing to work at reduced wages during the Retro Pay Period.

18. But with its hands on $225 Million and the opportunity to use it to favor some while disadvantaging others, ALPA devised a variety of supposed justifications for withholding

from a minority of pilots their fair share of the money.

19.     At United, as at all airlines, most pilots most of the time function as "line pilots," whose work consists exclusively of flying customers from one location to another – referred to as "flying the line."  Yet United's union pilots also include line pilots who from time to time fill other positions on a short- or long-term basis, performing other duties that support the line pilots and make their work possible.  These positions included management pilots and pilot instructors.  Each of these groups represents only a small minority of the overall ALPA pilot membership.

20.     In addition to management pilots and pilot instructors, these positions include ALPA representatives, who perform union-related duties rather than flying full-time.  Among other things, United Pilots acting as ALPA representatives negotiated the 2012 UPA and decided how to apportion the $225 Million lump sum retro pay payment.  Those ALPA representatives received their *pro rata* share of retro pay without any off-sets, reductions or special rules.  The United management pilots and pilot instructors, however, were not so fortunate.

21.     Rather than apportioning the $225 Million in a manner that would fairly reflect, on a *pro rata* basis, what each pilot lost as a result of working at the lower pay rates while the 2012 UPA was being negotiated, ALPA designed an allocation formula that included numerous arbitrary exceptions and special rules designed to ensure that the members of these minority groups would receive, at most, a fraction of their deserved retro pay, or none at all.

**A.     ALPA's Denial of Retro Pay to Management Pilots**

22.     Plaintiffs Barnes, Whitehead and Clark are or were United line pilots who during the relevant time period worked as dues-paying management pilots.

23.     United employs over 100 management pilots, which group forms only a very small minority of ALPA's some 6,000 United Pilot members.  The management pilots work

6

principally in flight operations and the training center. ALPA has long encouraged its best line pilot union members at United to serve as management pilots so as to ensure that the regular line pilots have the necessary resources and operational support from their most able colleagues who best understand the work line pilots have to do. Moreover, line pilots can and often do move into and out of management pilot positions over periods of time.

24. While the term "management pilot" suggests that these union pilots perform duties that are sometimes supervisory in nature (just as often they are organizational and service-oriented for the line pilots' benefit), ALPA has always recognized that the work involved confers essential benefits on line pilots in particular and on the entire union membership in general. Indeed, ALPA has for more than a quarter century insisted that United's management pilots be drawn from the union's membership. And throughout this time period ALPA demanded – and received – union dues and/or contract maintenance fees from United's management pilots based on their management pilot earnings. ALPA has insisted on receiving such dues and has further always expected the management pilots to abide by union rules and to support the union in any disputes with United. Management pilots also continued to accrue line pilot seniority while they were employed as management pilots and were free to move into and out of management pilot positions without any disruption to their seniority.

25. The principal component of the pay formula for every United Pilot is his or her hourly rate as determined by their bid-awarded aircraft (e.g., 747, 777, etc.), cabin position (e.g., Captain or First Officer), and tenure in the job – so-called "fleet, seat and longevity" – as negotiated between the Company and ALPA. Thus, for a line pilot, the main calculation for determining his monthly pay is simply the product of his effective hours worked (so-called "credit hours") multiplied by the ALPA-negotiated hourly rate for his fleet, seat and longevity.

7

26.     Management pilots are similarly compensated based on their fleet, seat and longevity, but because they generally do not fly a regular schedule of flight hours, their compensation is set at a pre-determined number of hours per month (at least 95 hours/month). The pre-determined set number of hours have no real relationship to how many hours management pilots actually work every month (they typically work far more hours),[3] but rather was simply a methodology to determine management pilots' rate of pay.

27.     Management pilots do not negotiate these pay rates with the Company, but rather rely on ALPA-negotiated increases in pay rates for fleet, seat and longevity for any increases in their pay.  Indeed, ALPA demanded and extracted union dues and/or contract maintenance fees from management pilots during this time period.  Throughout the negotiations of the 2012 UPA, therefore, management pilots relied on (and paid) ALPA to negotiate higher pay rates, which, in turn, would result in pay increases for all pilots, including management pilots.

28.     Management pilots were also led to believe by ALPA throughout the negotiations of the 2012 UPA that it was representing the interests of all pilots – including management pilots – in connection with its efforts to secure retro pay from the Company.  For example, a resolution passed by ALPA indicated that any additional benefit achieved during the negotiations would be allocated in a fashion "to make *each* United pilot as whole as possible with regards to retro dating back to the amendable date of Jan. 1 2010."  Management pilots also voted on the 2012 UPA.  In fact, ALPA representatives actively solicited management pilots' votes (in their management pilot capacity) to ratify the 2012 UPA.

29.     Had the 2012 UPA been signed in 2010 all of the management pilots – like all of the line pilots – would have enjoyed a significant increase in pay throughout the Retro Pay Period.  But because it took three years to negotiate the new contract, all of the management

---

[3] Management pilots typically worked at least 22 days per month under a 10-hour (or longer) work-day.

pilots – like all of the line pilots – continued to work at depressed rates of pay throughout the Retro Pay Period.

30.     Yet when the time came for ALPA to allocate the $225 Million among all of the United Pilots who had been denied pay increases over the preceding three years, the union irrationally and arbitrarily discriminated against the management pilots primarily by means of one simple but audacious tactic: ALPA falsely asserted that it had never represented the management pilots at all, including for the purposes of negotiating pay.  In other words, for years ALPA extracted union dues and/or contract maintenance fees from the earnings of management pilots, but now claims it owes no duty to those very pilots.  ALPA's only attempt to date at reconciling this astonishing assertion with its collection of dues and/or contract maintenance fees from the management pilots was to label those particular payments as "charitable contributions."

31.     The union thus claimed the right to withhold all of the management pilots' retro pay.  And while it went on to distribute some small amounts to some of the management pilots – admitting in another display of arbitrary conduct that it did so without any contractual or legal basis – all of the management pilots were deprived of most if not all of their fair share of retro pay, losses amounting to thousands if not tens of thousands of dollars each.

32.     While ALPA paid other pilots based on a *pro rata* share of their lost pay during the Retro Pay Period (albeit based on rates contained in a contract applicable to Delta Air Lines pilots, as opposed to the actual 2012 UPA),[4]  ALPA created the following arbitrary and discriminatory exceptions, off-sets and special rules for management pilots:

---

[4] As a surrogate for the hypothetical contract that ALPA and the Company might have reached in 2010 (had their negotiations not stalled for three years), the parties looked to a Delta Contract that had been in place during the Retro Pay Period from 2010 to 2012 (the "Delta Contract") to facilitate a compromise between ALPA's demands for 100% retro pay and the Company's preference for 0% retro pay – that is, the compromise that ultimately produced the $400 Million lump sum payment.  After receiving the retro pay lump sum payment, however, ALPA continued to rely on the Delta Contract as a basis for allocating retro pay to the United Pilots, as opposed to the actual pay provisions set forth in the 2012 UPA.

1. ***ALPA Arbitrarily Off-Set Annual Incentive Pay from Management Pilots' Retro Pay***

33.     ALPA arbitrarily reduced management pilots' retro pay by the amount of Annual Incentive Pay ("AIP") he or she received during the retro-pay period.  ALPA claimed this offset was proper because AIP increased the compensation for management pilots above what line pilots made and, therefore, management pilots have less of a "need" for a "back wage" payment. But this purported justification ignores the fact that management pilots earned these additional amounts for taking on the demands required of their positions.  It also ignores the fact that ALPA did not offset overrides/bonuses earned by line pilots during the Retro Pay Period, which were specifically called for under the 2003 contract.

34.     In other words, ALPA is punishing management pilots for receiving higher pay than the more politically powerful and majority group of line pilots.  There can be no dispute that had the 2012 UPA been signed earlier, management pilots would have been entitled to both the higher rates of compensation set forth in the 2012 UPA and their AIP.  ALPA's "judgment" that management pilots already earned enough and therefore do not "need" their retro pay is the very definition of arbitrary.

\*\*\*

2. ***ALPA Arbitrarily Reduced the Credit Hours Used to Set Management Pilots' Pay During the Retro Pay Period***

35.     ALPA arbitrarily calculated certain management pay credit hours based on the average monthly pay credit hours for the pilot's bid category in accordance with the 2003 contract, rather than on the hours actually used to set management pilots' compensation.  ALPA claimed this action was justified because they purportedly did not know the hours actually used to set management pilots' compensation.

10

36.     While this purported justification is insufficient in and of itself it is also not true because, among other reasons, management pilots paid ALPA union dues on the monthly management pay hours actually used to set their compensation, not on an "average" of others in their bid category.  No other pilot group, including those who act as ALPA representatives, was subjected to this methodology.

***

3.      *ALPA Completely Excluded Certain Credit Hours from the Calculation of Management Pilots' Retro Pay*

37.     ALPA arbitrarily excluded certain management pay credit hours all together from the calculation of retro pay.  ALPA justified this exclusion by falsely asserting that it had never represented the management pilots at all, and because of its belief that management pilots "are high level management (and likely high level earners)."   But, as noted above, for years ALPA charged and collected union dues and/or contract maintenance fees on all management pay hours, including those that it is now excluding from calculating retro pay.

38.     And the fact that management pilots may have been "high earners" (or "likely" to be a high earners) is irrelevant criteria for purposes of determining retro pay.  If they were entitled to more compensation under the pay scale set forth in the 2012 UPA, they should be entitled to their *pro rata* share of the retro pay sum for working at lower pay rates during the three years the new contract was being negotiated just like every other pilot.

***

39.     ALPA had always encouraged its best pilots to serve as management pilots, because that service would benefit all members of the union.  In this, the management pilots were and are no different from ALPA representatives, who likewise forego flying the line in order to perform services that benefit the union's members generally.  Yet, as a consequence of

11

ALPA's discriminatory and wholly irrational withholding of retro pay from its dues-paying United management pilots, Plaintiffs and other management pilots have suffered financial injuries amounting collectively to several millions of dollars.

**B. Defendants' Denial of Retro Pay to Pilot Instructors**

40.     Plaintiffs Bishop and Lish are United line pilots who during a portion of the relevant time period worked as pilot instructors.

41.     United employs over 100 pilot instructors, although this group, like the management pilots, constitutes only a small fraction of ALPA's United Pilots.

42.     While ALPA did not disclaim its duty to represent the pilot instructors, as it had in regards to the management pilots, it nonetheless manufactured an equally erroneous and damaging basis for withholding from them the lion's share of their retro pay.  Consequently, the pilot instructors, a group that made among the largest gains in the 2012 UPA, received nearly the smallest benefit from the $225 Million of retro pay.  Like the management pilots, the pilot instructors were collectively denied several million dollars through ALPA's irrational and discriminatory misallocation of the retro pay.

43.     As noted above, the principal component of the pay formula for every United Pilot is his or her hourly rate as determined by their fleet, seat and longevity.  While a line pilot's monthly pay is simply the product of his credit hours worked multiplied by the hourly rate for his or her actual fleet, seat and longevity, the compensation for United pilot instructors is and at all relevant times has generally been capped at a flat monthly pay rate, calculated using a single, pre-determined combination of fleet, seat and longevity at a pre-determined set number of hours.

44.     Under the 2003 contract, pay for United's pilot instructors was typically capped at the flat monthly amount equal to 89 credit hours for a 767/757 First Officer with six (6) years

longevity. This combination of fleet, seat, longevity and hours had nothing to do with what a pilot instructor's job was or even how many hours he or she actually worked every month, but rather was simply a methodology to determine pilot instructors' rate of pay.[5]

45. In other words, a United pilot instructor's compensation was based on two components: (i) the pre-determined combination of fleet, seat longevity and hours, and (ii) the hourly pay rates established for that fleet, seat and longevity.

46. Both components of the pilot instructors' compensation was increased substantially under the 2012 UPA. In addition to increases in the hourly pay rates, the pre-determined cap used to calculate pilot instructors' monthly pay was also increased to an amount equivalent to 90 hours for a First Officer with nine (9) years longevity at the second highest-rated aircraft rate (*i.e.*, A350, 747, 777, 787 rates). This higher pre-determined combination of fleet, seat, longevity and hours was a significant component of the pay raises obtained by pilot instructors under the 2012 UPA.

47. ALPA's decision to use the Delta Contract rather than the 2012 UPA for this purpose, opened the door for it to improperly withhold from the pilot instructors most of their deserved retro pay. While Delta line pilots were largely paid in the same manner as United line pilots (*i.e.*, actual credit hours based on pay rates for fleet, seat and longevity), the pay formula for Delta pilot instructors was substantively different than the pay formula for United pilot instructors.

48. Under the Delta Contract, that airline's pilot instructors were not subject to a pay cap, and thus each Delta pilot instructor was paid based primarily on his or her credit hours and hourly rate for his or her actual fleet, seat and longevity. ALPA used this methodological

_____
[5] Pilot instructors typically worked 18-19 days per month under a 6.5 hour work day (*i.e.*, 117 to 123.5 hours per month). Furthermore, all pilot instructors during the relevant time period had more than six (6) years of longevity and held at least a 767/757 First Officer bid.

distinction as an excuse to ignore a substantial component of the pay raise achieved by pilot instructors under the 2012 UPA.

49.     Rather than using a combination of fleet, seat, longevity and hours that would more accurately reflect the pay pilot instructors would have received but for the three year delay in negotiating the 2012 UPA, ALPA simply disregarded that component of pilot instructors' pay increase all together in calculating their retro pay.  Instead, ALPA used the combination of fleet, seat, longevity and hours contained in *the 2003 contract* to calculate pilot instructors' retro pay.

50.     No good faith reason existed to impose the 2003 contract provision into the formula that was supposed to provide the benefits of the 2012 UPA.  By doing so, ALPA artificially reduced a significant component of the pay raises pilot instructors received under the 2012 UPA for purposes of calculating their retro pay.

51.     Unlike other pilots, whose pay increases were primarily, if not entirely, based on the hourly pay rate increases set forth in the 2012 UPA, pilot instructors' pay increases were based in significant part (far more so than any other pilot group) on the increase to their pre-determined combination of fleet, seat, longevity and hours.  ALPA, in breach of its duty of fair representation to pilot instructors, failed to take this component of pilot instructors' pay into account whatsoever in calculating their retro pay.

52.     As a result, despite receiving the biggest pay increase under the 2012 UPA, pilot instructors received the smallest percentage of retro pay compared to what they would have received if the 2012 UPA was actually applied retroactively – a direct result of ALPA's use of only half of the pilot instructors' pay increase to calculate retro pay as opposed to the entirety of their pay increases as it did with other United Pilots (other than, of course, management pilots).

## CLASS ACTION ALLEGATIONS

53.     Plaintiffs bring this action pursuant to Rule 23 of the Federal Rules of Civil Procedure on behalf of United Pilots who were unfairly deprived of their share of retro pay due to the arbitrary exclusions and special rules interposed by ALPA in distributing the lump sum retro payment.  Plaintiffs Barnes, Whitehead and Clark seek to represent a sub-class of persons comprising all United pilots who, during any part of the period from January 1, 2010 through December 18, 2012, paid union dues and/or contract maintenance fees to ALPA while working as a United management pilot (the "Management Pilot Sub-Class").  Plaintiffs Barnes, Whitehead and Clark also seek, in the alternative, to represent a sub-class of persons comprising all United pilots who paid union dues and/or contract maintenance fees to ALPA while working as a United management pilot (the "Alternative Management Pilot Sub-Class").

54.     Plaintiffs Bishop and Lish seek to represent a sub-class of persons comprising all United pilots who, during any part of the period from January 1, 2010 through December 18, 2012, worked as a United pilot instructor (the "Pilot Instructor Sub-Class").

55.     The members of each of Plaintiffs' sub-classes are so numerous that joinder of all members is impracticable.  After investigation by Plaintiffs' counsel, Plaintiffs reasonably believe that each of the sub-classes comprises in excess of 120 members.

56.     Common questions of law and fact exist as to each sub-class.  These common questions predominate over questions, if any, affecting solely individual class members.

57.     The questions of law and fact common to the members of the Management Pilot Sub-Class include, but are not limited to:

a)     whether ALPA breached its duty of fair representation to the members of the Management Pilot Sub-Class by reducing management pilots' retro pay by the amount of

AIP he or she received during the Retro Pay Period;

b)     whether ALPA breached its duty of fair representation to the members of the Management Pilot Sub-Class by calculating certain management pay credit hours based on the average monthly pay credit hours for the pilots bid category in accordance with the 2003 contract, rather than on the credit hours actually used to set management pilots' compensation and upon which management pilots paid union dues;

c)     whether ALPA breached its duty of fair representation to the members of the Management Pilot Sub-Class by excluding certain management pay credit hours all together from the calculation of retro pay; and

d)     whether the members of the Management Pilot Sub-Class members suffered damages as a result of ALPA's breach of its duty of fair representation.

58.     The questions of law and fact common to the members of the Alternative Management Pilot Sub-Class include, but are not limited to:

a)     the extent, purposes and time period for which ALPA was obliged to represent the members of the Alternative Management Pilot Sub-Class; and

b)     to the extent that ALPA was not obliged to represent the members of the Alternative Management Pilot Sub-Class, whether those individuals are entitled to recover all union dues and/or contract maintenance fees they paid to ALPA that were based on their management pilot earnings.

59.     The questions of law and fact common to the members of the Pilot Instructor Sub-Class include, but are not limited to:

a.     whether ALPA breached its duty of fair representation to members of the Pilot Instructor Sub-Class by only taking into account the increase in hourly pay rates

16

in calculating pilot instructors' retro pay and failing to take into account the fact that a significant part of their pay raise under the 2012 UPA was due to the increase in the pre-determined combination of fleet, seat, longevity and hours used for their pay cap;

b. whether ALPA breached its duty of fair representation to members of the Pilot Instructor Sub-Class by using the combination of fleet, seat, longevity and hours under the 2003 contract's pay scale to calculate their retro pay; and

c. whether members of the Pilot Instructor Sub-Class suffered damages as a result of ALPA's breach of its duty of fair representation.

60. Plaintiffs' claims and defenses are typical of the claims and defenses of the members of their sub-classes.

61. Plaintiffs will fairly and adequately protect the interests of the members of their sub-classes. Plaintiffs have retained competent counsel experienced in class action litigation in state and federal courts nationwide and Plaintiffs have no interest adverse to any member of their sub-classes. Plaintiffs intend to prosecute this case vigorously on behalf of themselves and their sub-classes.

62. Class certification is proper under Rule 23(b)(1)(A) of the Federal Rules of Civil Procedure because the prosecution of separate actions by individual class members would create a risk of inconsistent or varying adjudications with respect to individual members of the sub-classes and establish incompatible standards of conduct for Defendant.

63. Class certification is proper under Rule 23(b)(1)(B) of the Federal Rules of Civil Procedure because the prosecution of separate actions by individual members of the sub-classes would create a risk of adjudications with respect to individual class members that would, as a

practical matter, be dispositive of the interests of the other members not parties to this adjudication and/or substantially impair their ability to protect these interests.

64.     Class certification is proper under Rule 23(b)(2) of the Federal Rules of Civil Procedure because ALPA has acted, or refused to act, on grounds generally applicable to the sub-classes, thereby making final injunctive relief or corresponding declaratory relief appropriate for the class.

65.     Class certification is proper under Rule 23(b)(3) of the Federal Rules of Civil Procedure because common issues of law and fact predominate over any questions affecting only individual members of the sub-classes, and a class action is superior to other available methods for the fair and efficient adjudication of this controversy.

**COUNT I**
**Breach of the Duty of Fair Representation**
**(on behalf of Plaintiffs Barnes, Whitehead**
**and Clark and the Management Pilot Sub-Class)**

66.     Plaintiffs Barnes, Whitehead and Clark incorporate all previous paragraphs into this Count I as if fully alleged herein.

67.     Plaintiffs Barnes, Whitehead and Clark assert herein a claim against ALPA for breach of its duty of fair representation to the Management Pilot Sub-Class under the Railway Labor Act.  Under the Railway Labor Act, ALPA, as the exclusive bargaining agent of United's Pilots, owed to the members of the Management Pilot Sub-Class a duty of fair representation. This duty encompasses the obligation to serve the interests of all United Pilots without hostility or discrimination toward any, to exercise its discretion with complete good faith, and honesty and to avoid arbitrary conduct.  The objective of the duty of fair representation is to provide substantive and procedural safeguards for minority members of the collective bargaining unit.

68.     A union breaches its duty of fair representation if, *inter alia*, it intentionally causes harm to an employee, discriminates against an employee or employee group, neglects the interests of a membership minority solely to advantage the membership majority, or by acting for the sole purpose of benefitting a stronger, more politically favored group over a minority segment of the union.

69.     ALPA has breached its duty of fair representation to the members of the Management Pilot Sub-Class by discriminating against, expressing hostility and acting with animosity towards them and arbitrarily choosing to disregard their interests in favor of the interests of the stronger, more politically favored majority, which includes ALPA representatives and line pilots, in its misallocation of the retro pay.

70.     As a consequence of ALPA's breach of its duty of fair representation, the members of the Management Pilot Sub-Class have been damaged collectively in the amount of several millions of dollars.

**WHEREFORE**, Plaintiffs Barnes, Whitehead and Clark request that the Court:

A.     Award the members of the Management Pilot Sub-Class compensatory damages in an amount to be determined herein, including pre- and post-judgment interest;

B.     Award the members of the Management Pilot Sub-Class their reasonable attorneys fee and costs of suit; and

C.     Grant such other and further relief as is just and proper under the circumstances.

### COUNT II
**Unjust Enrichment (in the alternative to Count I)**
**(on behalf of Plaintiffs Barnes, Whitehead and Clark**
**and the Alternative Management Pilot Sub-Class)**

71.     Plaintiffs Barnes, Whitehead and Clark incorporate all previous paragraphs into this Count II as if fully alleged herein.

19

72.    Defendant ALPA has demanded and received dues and/or contract maintenance fees from Plaintiffs Barnes, Whitehead and Clark and members of the Alternative Management Pilot Sub-Class for decades, including dues that have been calculated based upon the pay received for their work as management pilots.

73.    Now, however, ALPA has revealed that it does not and has not ever represented management pilots for any purpose, including for the purpose of negotiating the 2012 UPA and retro pay.  As a direct result, and if true, ALPA has collected money from Plaintiffs Barnes, Whitehead and Clark and members of the Alternative Management Pilot Sub-Class to which it was not entitled.  ALPA knowingly appreciated and accepted this benefit which has resulted and continues to result in an inequity to Plaintiffs Barnes, Whitehead and Clark and members of the Alternative Management Pilot Sub-Class.

74.    In the alternative to Count I, and to the extent it is found that ALPA was not obliged to represent the members of the Alternative Management Pilot Sub-Class, it would be unjust and inequitable to allow ALPA to retain the union dues and/or contract maintenance fees that were collected from the management pay of Plaintiffs Barnes, Whitehead and Clark and members of the Alternative Management Pilot Sub-Class.

75.    ALPA has thus unjustly received and retained a benefit belonging to Plaintiffs Barnes, Whitehead and Clark and members of the Alternative Management Pilot Sub-Class, who have therefore suffered a commensurate detriment constituting money damages in the collective amount of several millions of dollars.

**WHEREFORE**, Plaintiffs Barnes, Whitehead and Clark request that the Court:

A.    Award the members of the Alternative Management Pilot Sub-Class compensatory damages in an amount to be determined herein, including pre- and post-judgment

interest;

B.     Award the members of the Alternative Management Pilot Sub-Class their reasonable attorneys fee and costs of suit; and

C.     Grant such other and further relief as is just and proper under the circumstances.

<u>COUNT III</u>
**Breach of the Duty of Fair Representation**
**(on behalf of Plaintiffs Bishop and Lish the Pilot Instructor Sub-Class)**

76.     Plaintiffs Bishop and Lish incorporate all previous paragraphs into this Count III as if fully alleged herein.

77.     Plaintiffs Bishop and Lish assert herein a claim against ALPA for breach of its duty of fair representation to the Pilot Instructor Sub-Class under the Railway Labor Act.  Under the Railway Labor Act, ALPA, as the exclusive bargaining agent of United's Pilots, owes to the members of the Pilot Instructor Sub-Class a duty of fair representation.  This duty encompasses the obligation to serve the interests of all United Pilots without hostility or discrimination toward any, to exercise its discretion with complete good faith, and honesty and to avoid arbitrary conduct.  The objective of the duty of fair representation is to provide substantive and procedural safeguards for minority members of the collective bargaining unit.

78.     A union breaches its duty of fair representation if, *inter alia*, it intentionally causes harm to an employee, discriminates against an employee or employee group, neglects the interests of a membership minority solely to advantage the membership majority, or by acting for the sole purpose of benefitting a stronger, more politically favored group over a minority segment of the union.

79.     ALPA has breached its duty of fair representation to the members of the Pilot Instructor Sub-Class by discriminating against, expressing hostility and acting with animosity

21

towards them and arbitrarily choosing to disregard their interests in favor of the interests of the stronger, more politically favored majority, which includes ALPA representatives and line pilots, in its misallocation of the retro pay.

80.    As a consequence of ALPA's breach of its duty of fair representation, the members of the Pilot Instructor Sub-Class have been damaged collectively in the amount of several million dollars.

**WHEREFORE**, Plaintiffs Bishop and Lish request that the Court:

A.    Award the members of the Pilot Instructor Sub-Class compensatory damages in an amount to be determined herein, including pre- and post-judgment interest;

B.    Award the members of the Pilot Instructor Sub-Class their reasonable attorneys fee and costs of suit; and

C.    Grant such other and further relief as is just and proper under the circumstances.

<u>**JURY DEMAND**</u>

Plaintiffs hereby demand a trial by jury on all issues triable by right by a jury herein.


Dated:  November 5, 2013

                                                     Respectfully Submitted,

                                                     JAMES     BARNES,     PHILLIP
                                                     WHITEHEAD,    WALTER    CLARK,
                                                     DAVID  BISHOP  and  ERIC  LISH,
                                                     individually and on behalf of all others
                                                     similarly situated,


                                                     By:    _____/s/ Myron M. Cherry_____
                                                             One of the Attorneys for Plaintiff
                                                             and the Classes

Myron M. Cherry
mcherry@cherry-law.com
Jacie C. Zolna
jzolna@cherry-law.com
MYRON M. CHERRY & ASSOCIATES, LLC
30 North LaSalle Street, Suite 2300
Chicago, Illinois  60602
Phone:  (312) 372-2100
Facsimile:  (312) 853-0279
***Attorneys for Plaintiffs and the Sub-Classes***

## *CERTIFICATE OF SERVICE*

The undersigned hereby certifies that he served the foregoing **Amended Complaint** upon:

Michael E. Abram
mabram@cwsny.com
Joshua J. Ellison
jellison@cwsny.com
Michael L. Winston
mwinston@cwsny.com
Thomas N. Ciantra
tciantra@cwsny.com
COHEN, WEISS AND SIMON
330 West 42nd Street
New York, New York 10036

Jonathan A. Cohen
jonathan.cohen@alpa.org
Marcus C. Migliore
marcus.migliore@alpa.org
AIR LINE PILOTS ASSOCIATION, INTERNATIONAL
1625 Massachusetts Ave NW, 8th Floor
Washington, DC 20036

John R. McCambridge
Rami N. Fakhouri
docket@grippoelden.com
GRIPPO & ELDEN
111 South Wacker Drive
Chicago, Illinois 60606

via the electronic filing system, on the 5th day of November, 2013.


_____/s/ Myron M. Cherry_____