UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | | |
|---|---|---|
| JAMES BARNES, WALTER CLARK, and PHILIP WHITEHEAD, individually and on behalf of all others similarly situated, | ) ) ) ) | 13 C 6243 |
| Plaintiffs, | ) ) | Judge Feinerman |
| vs. | ) ) | |
| AIR LINE PILOTS ASSOCIATION, INTERNATIONAL, | ) ) | |
| Defendant. | ) | |

### MEMORANDUM OPINION AND ORDER

United Airlines pilots James Barnes, Philip Whitehead, and Walter Clark, on behalf of themselves and a class of United management pilots, allege that Air Line Pilots Association, International ("ALPA") unlawfully discriminated against them in its allocation of $225 million of retroactive pay ("retro pay") provided to United pilots after ALPA and United entered into a collective bargaining agreement in late 2012. Doc. 29. The management pilots claim that ALPA breached its duty of fair representation to them under the Railway Labor Act ("RLA"), 45 U.S.C. § 151 *et seq.,* and, in the alternative, that ALPA unjustly enriched itself in violation of Illinois law by accepting their payment of dues and fees. *Ibid.* Earlier in the litigation, the court denied ALPA's motion to dismiss and/or for summary judgment, ruling that Plaintiffs were entitled to limited discovery on the question whether ALPA, consistent with *Air Wisconsin Pilots Protection Committee v. Sanderson*, 909 F.2d 213, 215-16 (7th Cir. 1990), complied with its fair representation duty by providing a fair process for arbitrating disputes over the retro pay allocation. Docs. 83-84 (reported at 2014 WL 4057419 (N.D. Ill. Aug. 14, 2014)). The court then denied ALPA's motion for judgment on the pleadings as to the management pilots' claims,

1

Docs. 188-189 (reported at __ F. Supp. 3d __, 2015 WL 5821577 (N.D. Ill. Sept. 30, 2015)), and certified the management pilot class, Docs. 190-191 (reported at __ F.R.D. __, 2015 WL 5822436 (N.D. Ill. Sept. 30, 2015)). Familiarity with the court's prior opinions is assumed.

Now before the court is ALPA's summary judgment motion, which argues under *Sanderson* that the RLA fair representation claim fails because ALPA provided a fair process for arbitrating disputes over the retro pay allocation. Doc. 160. The motion is denied.

**Background**

The following facts are stated as favorably to Plaintiffs, the non-movants, as the record and Local Rule 56.1 allow. *See Hanners v. Trent,* 674 F.3d 683, 691 (7th Cir. 2012). In considering ALPA's summary judgment motion, the court must assume the truth of those facts, but does not vouch for them. *See Smith v. Bray,* 681 F.3d 888, 892 (7th Cir. 2012).

The general background of this case is set forth in the court's prior opinions. To summarize, United and ALPA in late 2012 entered into a collective bargaining agreement, the 2012 United Pilot Agreement ("2012 UPA"), which provided retro pay to compensate pilots for working at depressed pay rates during the nearly three years of negotiations over the new agreement. Doc. 29 at ¶¶ 14-16. The retro pay did not fully compensate United pilots for what they would have earned during the negotiating period had the 2012 UPA pay rates taken effect upon the expiration of the predecessor CBA in 2010. *Id.* at ¶ 17. As a result, ALPA had to allocate the retro pay among its various pilot groups. *Ibid*.

ALPA's administrative manual sets forth the procedures under which ALPA's Master Executive Councils ("MECs"), the bodies that manage bargaining and other decisions for ALPA members at different airlines, allocate lump sums among members. Doc. 170 at ¶ 5. Section 40.3.J of the manual allows an MEC to negotiate an allocation formula as part of a collective

bargaining agreement, which the United MEC did in this case. *Id*. at ¶¶ 6, 9. Section 40.3.J establishes a dispute resolution procedure that pilots dissatisfied with an MEC's allocation may invoke with the consent of the ALPA President or MEC Chairperson. *Id.* at ¶¶ 5, 10.

The dispute resolution process works as follows. First, ALPA's Executive Council, which consists of ALPA officers and Executive Vice Presidents elected by pilot representatives from all ALPA-represented carriers, reviews the challenged allocation in as "expeditious a manner as is appropriate," and either upholds the allocation or orders it modified. *Id*. at ¶¶ 11-12. A pilot seeking to challenge an Executive Council decision may invoke arbitration, subject to the Executive Council's approval. *Id*. at ¶ 13. The ALPA President determines the process for selecting an arbitrator. *Id*. at ¶ 14. The arbitrator, who has authority to decide procedural issues, must consider the Executive Council's decision but is not bound to follow it. *Id*. at ¶ 15. ALPA bears the costs incurred by the Executive Council and the arbitration proceeding, while the pilots bringing the appeal bear their own costs. *Id*. at ¶ 16.

United's merger with Continental and the December 2012 ratification of the 2012 UPA left ALPA with $225 million of retro pay to allocate among legacy United pilots. *Id*. at ¶¶ 17-20. In mid-January 2013, the United MEC Chairperson notified the pilots of the MEC's allocation and of the Section 40.3.J dispute resolution process. *Id*. at ¶ 23. Shortly thereafter, numerous management pilots, including Barnes and Whitehead, challenged the allocation before the ALPA Executive Council. *Id*. at ¶ 25; Doc. 176 at ¶ 3. Following a hearing, the Executive Council upheld the allocation. Doc. 170 at ¶ 31.

On March 6, 2013, ALPA informed United pilots of their right to appeal via arbitration the Executive Council's decision, and some management pilots, including Barnes and Whitehead, appealed. *Id*. at ¶¶ 36, 44. ALPA's President selected Richard Bloch, an

3

experienced labor arbitrator and past president of the National Academy of Arbitrators, as the arbitrator. *Id*. at ¶¶ 33-34. Citing alleged unfairness about certain of the arbitration procedures, several pilots, including Barnes and Whitehead, declined to participate. *See id*. at ¶¶ 37, 40-42, 46; Doc. 176 at ¶¶ 48-49. After an arbitration hearing, Bloch affirmed the Executive Council's decision and thus the retro pay allocation. Doc. 162-2; Doc. 170 at ¶¶ 59-60.

**Discussion**

Section 153 First (q) of the RLA, 45 U.S.C. § 153 First (q), allows "[a] reviewing court [to] … disturb an arbitration award only if the arbitrator did not comply with the Railway Labor Act, exceeded the arbitral jurisdiction, or committed fraud." *Bhd. of Locomotive Eng'rs & Trainmen, Gen. Comm. of Adjustment, Cent. Conference v. Union Pac. R.R. Co.*, 719 F.3d 801, 803 (7th Cir. 2013). Although § 153 First by its terms applies only to disputes between employees and a carrier, *see Czosek v. O'Mara*, 397 U.S. 25, 27-28 (1970); *Conley v. Gibson*, 355 U.S. 41, 44 (1957), *Sanderson* holds that a standard of review materially identical to the § 153 First (q) standard governs judicial review of arbitrations in the airline industry between a union and its members:

> A union empowered by federal law to be the exclusive representative of a group of workers for purposes of bargaining with their employer over wages and over terms and conditions of employment has a correlative duty, fiduciary in character, to represent *all* members of the group fairly, that is, without favoritism, prejudice, or other discrimination. ALPA satisfied that duty in this case, however, by establishing, long before the case arose, a fair *process* for determining [the issue in question]. Representatives of the affected workers negotiate, and if they are unable to come to terms the matter is referred to arbitration. … More important, ALPA's belief that such arbitrations should be final and binding and its corollary that ALPA shall be obligated to defend them would not have prevented the pilots from challenging the arbitration award in court, if the award were infected by fraud or by a serious conflict of interest or were inconsistent with the terms of reference to arbitration.

909 F.2d at 216 (citations omitted). Although Plaintiffs challenge several aspects of the dispute resolution process that ALPA employed in this case, they must show only a single instance of

4

"fraud" or "serious conflict of interest"—or, to be more precise, they must show that that a reasonable trier of fact could find such a single instance—to survive ALPA's present summary judgment motion.

Plaintiffs contend that "[t]he arbitration at issue here was unfair because it vested one party, ALPA, with sole authority to select the arbitrator." Doc. 168 at 18. They are correct. In *Chicago Teachers Union, Local No. 1 v. Hudson*, 475 U.S. 292 (1986), nonmembers of a public employee union brought suit to challenge the union's procedures for determining the service fee they were charged, *see Abood v. Detroit Board of Education*, 431 U.S. 209 (1977), to defray the union's collective bargaining, contract administration, and grievance adjustment costs. Much like ALPA's procedure here, the dispute resolution procedure in *Hudson* began with review by the union's Executive Committee, followed by review by the union's Executive Board, and ended with arbitration before an arbitrator selection by the union's President from a list maintained by the state board of education. 475 U.S. at 296. The Supreme Court held that "[t]he third step—review by a Union-selected arbitrator—is … inadequate because the selection represents the Union's unrestricted choice from the state list." *Id*. at 308. In so holding, the Supreme Court quoted with favor the Seventh Circuit's observation in the decision under review that "the 'most conspicuous feature of the procedure is that from start to finish it is entirely controlled by the union, which is an interested party, since it is the recipient of the agency fees paid by the dissenting employees.'" *Ibid*. (quoting *Hudson v. Chi. Teachers Union Local No. 1*, 743 F.2d 1187, 1194-95 (7th Cir. 1984), *aff'd*, 475 U.S. 292 (1986)). The Supreme Court added:

> [A]n expeditious arbitration might satisfy the requirement of a reasonably prompt decision by an impartial decisionmaker, so long as the arbitrator's selection did not represent the Union's unrestricted choice. In contrast to the Union's procedure here, selection of an arbitrator frequently does not represent one party's unrestricted choice from a list of state-approved arbitrators.

*Id*. at 308 n.21.

In a parenthetical buried in a footnote, ALPA suggests that *Hudson* is inapposite here because it was decided under the First Amendment—as noted, the union there was a public employee union—while the present case arises under the RLA. Doc. 175 at 12 n.4. This argument fails to persuade. In justifying and enforcing the RLA fair representation duty, the Supreme Court regularly invokes constitutional concerns. *See*, *e.g.*, *Vaca v. Sipes*, 386 U.S. 171, 181-82 (1967) (noting that "the congressional grant of power to a union to act as exclusive bargaining representative, with its corresponding reduction in the individual rights of the employees so represented, would raise grave constitutional problems" if unchecked, and that "the duty of fair representation has stood as a bulwark to prevent arbitrary union conduct against individuals stripped of traditional forms of redress by the provisions of federal labor law"); *Steele v. Louisville & Nashville R.R. Co.*, 323 U.S. 192, 202 (1944) ("We think that the Railway Labor Act imposes upon the statutory representative of a craft at least as exacting a duty to protect equally the interests of the members of the craft as the Constitution imposes upon a legislature to give equal protection to the interests of those for whom it legislates. Congress has seen fit to clothe the bargaining representative with powers comparable to those possessed by a legislative body both to create and restrict the rights of those whom it represents, but it has also imposed on the representative a corresponding duty.") (citation omitted); *see also Frandsen v. Bhd. of Ry., Airline & S.S. Clerks*, 782 F.2d 674, 679 (7th Cir. 1986); *Baker v. Amsted Indus., Inc.*, 656 F.2d 1245, 1249 (7th Cir. 1981). *Hudson* itself observed that *Abood*, which held that the First Amendment did not prohibit "a public employer to designate a union as the exclusive collective-bargaining representative of its employees, and to require nonunion employees, as a condition of employment, to pay a fair share of the union's cost of negotiating and administering

6

a collective-bargaining agreement," had its roots in "[e]arlier cases … constru[ing] the Railway Labor Act to permit a similar arrangement without violating the Constitution." 475 U.S. at 301 & n.8. And in the decision the Supreme Court affirmed in *Hudson*, the Seventh Circuit noted: "Although the Supreme Court in *Abood* suggested that an internal union procedure might be an appropriate method of protecting objectors' rights, see 431 U.S. at 240, it was merely repeating a suggestion that had been made under a case under the Railway Labor Act. That act, as it has been interpreted, both imposes on the union a duty to represent dissenters fairly and creates remedies for violation of that duty." *Hudson*, 743 F.2d at 1195 (citing *Bhd. of Ry. & S.S. Clerks v. Allen*, 373 U.S. 113, 122 (1963)) (citation omitted).

In this particular context, then, there is sufficient congruence between RLA fair representation standards and constitutional standards that *Hudson* governs this RLA case. *See Baker*, 656 F.2d at 1249 ("It early became apparent that majority representatives in the sphere of industrial relations were no less capable of misusing their considerable authority than their counterparts in the political arena. Therefore, in rough analogy to the limits imposed on legislative power by the equal protection clause of the Constitution, the courts have imposed on majority representatives a responsibility equal in scope to their authority, the responsibility and duty of fair representation.") (internal quotation marks omitted); *Miller v. Air Line Pilots Ass'n*, 108 F.3d 1415 (D.C. Cir. 1997) (applying *Hudson* to a suit by nonmembers against ALPA). Accordingly, ALPA's unilateral ability to select the arbitrator hearing the retro pay allocation challenge defeats its argument that it complied with its RLA fair representation duty, as interpreted in *Sanderson*, by providing a fair process for resolving disputes over the allocation— or so a reasonable trier of fact could conclude. *See Chavarria v. Ralphs Grocery Co.*, 733 F.3d 916, 927 (9th Cir. 2013) (in a wage-and-hour case, deeming "unconscionable" under state law an

7

arbitration provision that allowed one party to unilaterally select the arbitrator); *McMullen v. Meijer, Inc.*, 355 F.3d 485, 494 (6th Cir. 2004) (holding under the Federal Arbitration Act that a procedure that "grants one party to the arbitration unilateral control over the pool of potential arbitrators … inherently lacks neutrality" and violates the procedural standards for arbitration set forth in *Gilmer v. Interstate/Johnson Lane Corp.*, 500 U.S. (1991)); *cf. Ping v. Nat'l Educ. Ass'n*, 870 F.2d 1369, 1373 (7th Cir. 1989) ("In this case, the selection of the arbitrator did not represent the defendants' unrestricted choice.  Instead, the arbitrator was selected by the American Arbitration Association, according to their own internal selection rules, without any input by the defendants.  That procedure clearly meets the requirement [in *Hudson*] that the selection of the arbitrator not represent the untrammeled choice of the unions.").

It bears mention that the union in *Sanderson* (ALPA, incidentally) almost certainly did not unilaterally select the arbitrators tasked with resolving the dispute giving rise to that case.  The Seventh Circuit's opinion does not directly address the matter, other than observing that a "board of arbitrators"—not a single arbitrator—made the award.  909 F.2d at 215; *see also* Complaint at ¶ 17, *Air Wis. Pilots Protection Comm. v. Sanderson*, 1989 WL 58273 (N.D. Ill. Apr. 10, 1987) (No. 87 C 3382) (alleging that the arbitration took place "before a Board of Arbitration chaired by Arbitrator Rolf Valtin") (reproduced at Doc. 105-1 at 11).  The Seventh Circuit noted that although the *Sanderson* plaintiffs "disagree[d] violently with the result of the arbitration," they did "not point[] to any features of the process," least of all "the method of selecting the arbitrators[,] … as being unfair." *Id*. at 216.  It is inconceivable that the *Sanderson* plaintiffs would have abstained from challenging the fairness of the selection process had ALPA selected the arbitrators unilaterally.

Moreover, both sides of the arbitration in *Sanderson* were pilot groups that ALPA acknowledged representing, *see id*. at 214-15, meaning that ALPA, as it admits, "had no interest" in that arbitration's outcome, Doc. 175 at 13. By contrast, ALPA here asserts that it did not even represent the management pilots for purposes of collective bargaining; one of ALPA's arguments for why it did not violate any duty to fairly represent the management pilots is that it did not represent them in the first place and thus owed them no duty at all. Doc. 34 at 10-12; Doc. 97 at ¶¶ 9, 19, 24, 26-28, 42; Doc. 133 at 17-19; Doc. 156 at 12-14; *see* 2015 WL 5821577 at *7 (where the court rejected that argument for purposes of ALPA's Rule 12(c) motion). And because the retro pay allocation was zero-sum—distributing any monies from a finite pot to one group necessarily reduced the other groups' possible shares—ALPA's interest in upholding its allocation—an allocation that, viewing the facts in the light most favorable to Plaintiffs, would tend to favor the groups that ALPA believed it was representing—made its interests adversarial to the management pilots' interests. Thus, even more so than in *Sanderson*, a fair dispute resolution process in this case required an arbitrator whom ALPA did not unilaterally select.

ALPA's contention that it lacked "a plain financial interest in the outcome" in the retro pay arbitration, Doc. 175 at 12, fails not only because (a reasonable factfinder could conclude that) it had an interest in favoring the pilot groups whom it acknowledged representing over the management pilots, but also because an arbitral reversal of the retro pay allocation could have had financial repercussions for ALPA. If Bloch had invalidated ALPA's allocation, ALPA would have been left with two unpalatable options: disburse from its coffers to the management pilots the monies they should have been allocated, or renege on its announced allocation, resulting in a lower share for non-management pilots than they had been promised and risking their ire. United is the world's fourth largest airline by passengers carried and second largest

public airline by revenue. *See* International Air Transport Association, *World Air Transport Statistics* 2014, at 41 (2015), https://perma.cc/US3W-DUZ9; "The World's Biggest Public Companies," *Forbes* (2015), http://perma.cc/HQS8-Z7SR. Despite ALPA's protests that its financial interests in the allocation and ensuing arbitration have "no basis in reality," Doc. 175 at 13, ALPA's continuing representation of United pilots is surely a financial and reputational boon for ALPA—and, as the Seventh Circuit noted in *Sanderson*, airline pilots may switch unions if they become unhappy with the incumbent. 909 F.2d at 215 (noting "some of [the Air Wisconsin pilots] tried to replace ALPA as the collective bargaining representative … with a newly created union").

ALPA retorts that "[a]bsent facts to the contrary, courts presume that a designated arbitrator will decide a case impartially." Doc. 161 at 19; Doc. 175 at 11. The cases cited by ALPA to support this proposition concern System Boards of Adjustment, tribunals mandated by the RLA that have representatives from both the carrier and the union; it is hardly surprising that those cases hold that the composition of tribunals mandated by the RLA does not violate … the RLA. *See Del Casal v. Eastern Airlines, Inc.*, 634 F.2d 295, 299 (5th Cir. Unit B 1981); *Cunningham v. United Airlines, Inc.*, 2014 WL 441610, at *6 (N.D. Ill. Feb. 4, 2014), *aff'd on other grounds sub nom. Cunningham v. Air Line Pilots Ass'n, Int'l*, 769 F.3d 539 (7th Cir. 2014). ALPA's argument misses the point in any event. The key here is not how Bloch would or would not or did or did not decide the dispute, but rather the process by which he was selected. Had ALPA appointed Jim Holderman, Wayne Andersen, David Coar, or Mark Filip (all retired district judges of the Northern District of Illinois) as arbitrator, its unilateral selection authority still would have rendered the process infirm under *Hudson*. As the Seventh Circuit put it in the decision affirmed by the Supreme Court in *Hudson*:

> There are 15 federal district judges in active service in the Northern District of Illinois, all unimpeachably accredited; and yet the union would not try to defend a procedure that let it (or the dissenters!) pick the judge to preside in this case. "Next to the impropriety of being Judge in one's own cause, is the appointment of the Judge." 2 Records of the Federal Convention of 1787, at 82 (Farrand rev. ed. 1937) (remarks of Gouverneur Morris). The situation here is even more troublesome. The arbitrator, unlike a federal judge, is not paid a salary that is independent of the number of cases he presides over, or of the goodwill of a litigant. The arbitrator is paid for each arbitration, and this gives him a financial interest in deciding cases favorably to the union—which hires him, and incidentally which pays him.

743 F.2d at 1195 (citations omitted). It therefore does not matter that, as ALPA contends, Doc. 161 at 20-21, Bloch was bound by the Code of Professional Responsibility for Arbitrators of Labor-Management Disputes of the National Academy of Arbitrators. *Cf. Merit Ins. Co. v. Leatherby Ins. Co.*, 714 F.2d 673, 680 (7th Cir. 1983) ("Although we have great respect for the Commercial Arbitration Rules and the Code of Ethics for Arbitrators, they are not the proper starting point for an inquiry into an award's validity … The arbitration rules and code do not have the force of law.").

Finally, ALPA unpersuasively argues that because "scores of challenging pilots … appealed to arbitration," it was infeasible to have a "'joint' selection process" for the arbitrator. Doc. 175 at 11. An unfair process cannot be saved by invoking administrative ease. *See Albers v. Comm'r*, 414 U.S. 982, 985 (1973) ("[E]ase of administration is too high a price to pay for the presumably unforeseen and undeniably harsh consequences."); *Vlandis v. Kline*, 412 U.S. 441, 451 (1973) ("The State's interest in administrative ease … cannot, in and of itself, save the conclusive presumption from invalidity under the Due Process Clause."); *Lister v. Hoover*, 706 F.2d 796, 801 (7th Cir. 1983) (recognizing that certain "values are substantial enough to outweigh the defendants' interest in avoiding administrative expense and bother"). Indeed, accepting ALPA's argument would lead to perverse results. Because the most important union decisions are likely to attract the deepest opposition and greatest number of challengers, holding

that a large number of challengers eliminates or mitigates a union's duty to ensure that an arbitrator is selected fairly would allow the union to inoculate its most questionable, controversial, or otherwise consequential actions. Such a holding would remove that essential procedural protection in the very instances where it is needed most.

**Conclusion**

To summarize, a reasonable factfinder could conclude that ALPA's unilateral selection of Bloch as the arbitrator to hear the retro pay allocation challenge "infected" the arbitration process with "a serious conflict of interest." *Sanderson*, 909 F.2d at 216. ALPA's summary judgment motion is accordingly denied.

November 6, 2015

United States District Judge