In the

# United States Court of Appeals

## For the Seventh Circuit

———————————

No. 17-1438

DAVID BISHOP and ERIC LISH,

*Plaintiffs-Appellants*,

*v.*

AIR LINE PILOTS ASSOCIATION,
INTERNATIONAL,

*Defendant-Appellee*.

———————————

Appeal from the United States District Court for the
Northern District of Illinois, Eastern Division.
No. 1:13-cv-06243 — **Gary Feinerman**, *Judge*.

———————————

ARGUED SEPTEMBER 27, 2017 — DECIDED AUGUST 13, 2018

———————————

Before RIPPLE, SYKES, and HAMILTON, *Circuit Judges*.

RIPPLE, *Circuit Judge*. United Airlines pilot instructors David Bishop and Eric Lish brought this action against their union, the Air Line Pilots Association ("ALPA"). They alleged that ALPA had breached its duty of fair representation in its allocation of a retroactive pay settlement among different groups of pilots. ALPA moved for judgment on the pleadings; it contended that the plaintiffs had not alleged

adequately that ALPA acted arbitrarily, discriminatorily, or in bad faith. The district court granted the motion and dismissed the case. Mr. Bishop and Mr. Lish timely appealed and seek reversal of the district court's dismissal of their claims. We hold that the district court prematurely dismissed the plaintiffs' well-pleaded allegations. We therefore reverse the judgment of the district court and remand the case for further proceedings consistent with this opinion.

## I

## BACKGROUND

### A.

In 2003, when United Airlines was in the throes of bankruptcy, United and ALPA negotiated a concessionary collective bargaining agreement ("CBA") that resulted in wage and benefit cuts.[1] This 2003 CBA became amendable on January 1, 2010, and, as required under the Railway Labor Act, 45 U.S.C. § 151 *et seq.*, the pilots continued to work under the 2003 CBA until ALPA and United could negotiate a new one. *See id*. § 156; *see also Detroit & Toledo Shore Line R.R. v. United Transp. Union*, 396 U.S. 142, 148–49 (1969).

It took nearly three years for ALPA and United to settle on a new CBA (the "2012 United Pilot Agreement" or the

---

[1] Because the district court dismissed the plaintiffs' claims on ALPA's motion under Federal Rule of Civil Procedure 12(c), we recite the plaintiffs' version of the facts. In doing so, "we draw all reasonable inferences and facts in favor of the [plaintiffs], but need not accept as true any legal assertions." *Wagner v. Teva Pharm. USA, Inc.*, 840 F.3d 355, 358 (7th Cir. 2016).

No. 17-1438                                                                                    3

"2012 UPA"). Throughout this extended negotiation process, United pilots and ALPA assumed that the new CBA would include retroactive compensation for the years that the pilots had worked under the amendable CBA. United had merged with Continental Airlines while the 2003 CBA still was in effect. The parties therefore covered both legacy United and legacy Continental pilots in the 2012 UPA.

The vast majority of United's pilots are "line pilots."[2] Their "work consists exclusively of flying customers from one location to another—referred to as 'flying the line.'"[3] Mr. Bishop and Mr. Lish are in a second classification. They are pilot instructors. The present dispute centers on how ALPA chose to allocate the negotiated retroactive pay settlement between line pilots and pilot instructors.[4]

Line pilot pay is determined by two factors: (1) the pilot's "fleet, seat, and longevity" combination, and (2) an hourly rate multiplied by the number of hours worked. A pilot's fleet, seat, and longevity combination is determined by the type of aircraft a pilot flies ("fleet"); the rank the pilot occupies in that aircraft ("seat"); and the length of time since the pilot was hired ("longevity"). The CBA then sets an hourly rate for each possible fleet, seat, and longevity combination. Line pilots are paid per number of hours actually worked based on this rate.

---

[2] R.29 at 6.

[3] *Id.*

[4] There is also a third group of pilots, management pilots. They were once parties to this litigation but have settled their claims.

Pilot instructors, by contrast, are salaried pilots. To arrive at the appropriate salary, the CBA adopts a fleet, seat, and longevity combination that applies equally to all pilot instructors.[5] Then, United takes the hourly rate that would be assigned to a line pilot with that same fleet, seat, and longevity combination and multiplies it by a predetermined number of hours. This number of hours has no relation to the number of hours actually worked by each pilot instructor. Under the 2003 concessionary CBA, all pilot instructors were capped at a fleet, seat, and longevity combination of "a 767/757 First Officer with six (6) years longevity."[6] They were given a salary equivalent to what a line pilot with that combination would earn for eighty-nine flight hours in a month.

The line pilots gained wage increases in the 2012 UPA through increased hourly rates and some redefinition of how the fleet, seat, and longevity combination is calculated. The pilot instructors' pay was affected by a change in their predetermined fleet, seat, and longevity cap, as well as the number of credit hours per month they were given. Under the 2012 UPA, pilot instructors' fleet, seat, and longevity combination was increased to "a First Officer with nine (9)

---

[5] The predetermined fleet, seat, and longevity combination for pilot instructors is written like a salary cap. If a pilot instructor's *actual* fleet, seat, and longevity combination were lower than the predetermined cap, the pilot instructor's pay would be calculated based on his *actual* combination. Here, though, during the relevant time period, all pilot instructors had *actual* fleet, seat, and longevity combinations that exceeded the predetermined cap.

[6] R.29 at 12.

years longevity at the second highest-rated aircraft rate (*i.e.*, A350, 747, 777, 787 rates)."[7] They were compensated at an amount equivalent to ninety hours worked each month for a pilot with that fleet, seat, and longevity combination. Under this 2012 UPA, pilot instructors received the largest pay increase.

When it settled on the 2012 UPA with ALPA, United agreed to give ALPA a $400 million lump-sum settlement to compensate pilots for the nearly three-year delay in reaching a new CBA. An intra-union arbitration designated $225 million for legacy United pilots and $175 million for legacy Continental pilots. The $225 million allocated for legacy United pilots was not enough to compensate the United pilots fully for the pay they should have been receiving while the 2012 UPA was being negotiated. United left ALPA to allocate the settlement among its various groups of members.

ALPA generated a formula to calculate each pilot's share of retroactive pay relative to the $225 million designated for legacy United pilots. In crafting this formula, ALPA employed a Delta Airlines CBA as a comparator to ascertain what each pilot *should have been* earning during the three years of negotiation. ALPA reasoned that because Delta was a peer competitor, its pay rates during that time period would be similar to what the United pilots should have been earning during the same period.

To calculate the line pilots' retroactive pay, ALPA applied Delta's hourly rate to each line pilot's *actual* fleet, seat,

---

[7] *Id.* at 13.

and longevity combination during the negotiation period and then considered the number of hours the United line pilot *actually* worked during the negotiation period. ALPA then took the difference between this fictional wage and the line pilot's actual wages for that time period to calculate what it called a "Delta differential" for each line pilot.[8] Finally, ALPA used the Delta differential to calculate each pilot's pro rata share of the $225 million settlement payment.

ALPA employed a different approach for pilot instructors. Instead of basing the United pilot instructors' retroactive pay on what Delta pilot instructors were paid under the comparator Delta CBA, ALPA applied its line pilot formula equally to pilot instructors. It calculated what a Delta *line pilot* would have earned for the pilot instructors' predetermined fleet, seat, and longevity combination and predetermined number of hours under the 2003 CBA and based each pilot instructor's "Delta differential" on that calculation.[9]

Because the $225 million was not enough to compensate each pilot fully for the delay, no pilot received 100 percent of his retroactive pay, but line pilots received 38 percent of their retroactive pay under ALPA's formula. This stands in contrast to the pilot instructors, who received only 15 percent of theirs. Although ALPA applied the same formula equally to both groups of pilots, the same formula resulted

---

[8] Appellant's Br. 4

[9] Delta did not use a fleet, seat, and longevity cap in its calculation of pay for its pilot instructors. Instead, Delta based its pilot instructors' pay on their actual fleet, seat, and longevity combinations.

in artificially deflated retroactive pay calculations for pilot instructors because of the significant differences in how their pay is calculated. Furthermore, because there was a fixed amount of money in the lump-sum settlement, any advantage the line pilots gained in the application of this formula came at the expense of the pilot instructors.

The difference comes from how line pilots were compensated for the three-year delay in negotiations. Under the Delta CBA, the hourly rate for each fleet, seat, and longevity combination automatically increased each year for which ALPA used the Delta CBA to calculate retroactive pay.[10] The 2003 United CBA similarly provided for automatic increases in the hourly rate for each fleet, seat, and longevity combination for each year contemplated by the 2003 CBA,[11] but during the negotiations period, the pilots were locked in at the 2009 rates, the last year for which the 2003 United CBA set rates.[12] By using the Delta CBA rates as a comparator, ALPA gave the line pilots the advantage of a built-in increase in the most significant part of their pay formula—the hourly rate— for each year that ALPA was in negotiations with United. However, the most significant variable in the calculation of pilot instructors' pay is the predetermined fleet, seat, and longevity combination and number of monthly hours. Because ALPA did not take into account the increased fleet, seat, and longevity cap in calculating the pilot instructors'

---

[10] R.134-2 at 10–12.

[11] R.134-3 at 4–8.

[12] R.134-1 at 41.

retroactive pay, the pilot instructors were locked in at their previous combination (set by the 2003 concessionary CBA) for the entire time that the 2012 UPA was being negotiated. Put another way, even though ALPA did not use the terms of the 2012 CBA in calculating *any* pilot's retroactive pay, using the Delta CBA as a comparator had the effect of giving the line pilots a competitive hourly rate for each year that ALPA was in negotiations with United. ALPA also considered each line pilot's actual fleet, seat, and longevity combination for the negotiation period. The pilot instructors also got the benefit of Delta's hourly rates but not the benefit of the increase to their fleet, seat, and longevity cap. Under this formula, pilot instructors were hurt more by the three-year delay than the line pilots were.

In sum, although pilot instructors also received increased hourly rates based on the Delta CBA, they did not receive any increases in the most significant factor for *their* pay calculation—their fleet, seat, and longevity combination. Rather, their fleet, seat, and longevity combinations, as well as their set number of monthly hours, remained locked in at the 2009 amounts set by the 2003 CBA.

**B.**

Mr. Bishop and Mr. Lish believed that ALPA favored the line pilots over pilot instructors for political reasons because the line pilots make up such a large percentage of ALPA's membership and, therefore, violated its duty of fair representation. They allege that the pilot instructors received the largest pay increase under the 2012 UPA but the smallest percentage of their retroactive pay for the negotiations period.

No. 17-1438                                                                      9

The pilot instructors first raised their complaint through the dispute resolution mechanism set forth in Letter of Agreement 24, where ALPA formalized its allocation methodology. That document provided for the resolution of all disputes about the retroactive pay allocation through an expedited arbitration before the ALPA Executive Council. The pilot instructors invoked their right to arbitration and also challenged the arbitration procedures themselves. They requested that "(1) the parties jointly select the arbitrator; (2) the arbitrator be instructed to make an independent decision without giving deference to either side; (3) the parties be allowed to take some discovery; and (4) the arbitration proceed on behalf of a class of affected individuals."[13] ALPA rejected these proposals and conducted the arbitration according to the established procedures.

During arbitration, an ALPA representative testified that Mark Arellano, the pilot instructors' representative on the council that set the allocation methodology, was the individual who proposed the retroactive pay formula about which the pilot instructors now complain. Specifically, the representative testified that the committee "relied heavily on [Arellano's] advice," that "[Arellano] was an integral part of the committee," and that Arellano had recommended the formula because it "treat[ed] [the pilot instructors] just like they get treated by everybody else."[14]

---

[13] R.84 at 4.

[14] R.149-2 at 24–25.

The record contains, however, material that tells a different story. According to those documents, Arellano had told the pilot instructors that he did *not* agree with the retroactive pay formula as it applied to them because he knew that it did not accurately reflect the retroactive pay to which they were entitled.[15] Further, Arellano had expressed this opinion "on numerous occasions" to the committee charged with setting the formula.[16] When the pilot instructors inquired further, Arellano told them that the committee wanted "something as simple as possible" and that the decision to treat pilot instructors with the same formula was "just politics."[17] Arellano also warned the pilot instructors that if they challenged the allocation, there would be "repercussions" and that the committee would try to take away other benefits from the pilot instructors.[18]

## C.

The arbitrator confirmed ALPA's allocation methodology in May 2013. The pilot instructors filed the operative complaint on November 5, 2013, in the Northern District of Illinois. They were joined as plaintiffs with another group of pilots, management pilots, who alleged that they were harmed by the retroactive pay allocation in different ways that are not relevant to the merits of this appeal. The pilot

---

[15] *Id.* at 6.

[16] *Id.*

[17] *Id.* at 3.

[18] *Id.* at 4.

instructors alleged that ALPA breached its duty of fair representation under the Railway Labor Act, 45 U.S.C. § 151 *et seq.* ALPA first moved for summary judgment as to both groups of pilots on the basis of the arbitration. The district court denied ALPA's motion for summary judgment and held that the plaintiffs were entitled to discovery on the integrity of the arbitration.[19] ALPA then moved for judgment on the pleadings against both groups of plaintiffs under Federal Rule of Civil Procedure 12(c), urging that regardless of the integrity of the arbitration, the complaint did not allege adequately that it had breached its duty of fair representation.

The district court found that, as to the pilot instructors, ALPA had not breached its duty of fair representation because the limited pool of funds required ALPA to compromise, and it was not irrational or arbitrary for ALPA to apply the same pay formula to all of the pilots. Further, the district court concluded, the pilot instructors had received the largest pay increase under the 2012 UPA, and it was rational for ALPA to conclude that they should not also receive "a larger share of the $225 million pie."[20] Finally, although the pilot instructors alleged that ALPA had acted in bad faith to benefit the line pilots and harm the pilot instructors (a minority segment of ALPA's membership), the district court

---

[19] Although the pilot instructors have briefed their contentions relating to the arbitration, these issues were never decided definitively by the district court and therefore are not ripe for decision on this appeal.

[20] R.189 at 10.

concluded that ALPA's motive was "irrelevant" because the pay allocation decision was rational and not arbitrary.[21]

The district court therefore granted ALPA's Rule 12(c) motion as it pertained to the pilot instructors, although it allowed the management pilots' claims to proceed for unrelated reasons. Because the management pilots remained in the litigation as plaintiffs after Mr. Bishop and Mr. Lish were dismissed, the district court did not enter a final judgment against the pilot instructors until February 9, 2017, after the management pilots settled with ALPA just before trial.

## II

The pilot instructors now challenge the district court's dismissal of their claims on ALPA's Rule 12(c) motion. For the reasons stated below, we reverse the district court's dismissal of the plaintiffs' claims.

## DISCUSSION

### A.

The law governing the procedural context of this case is well established. We review de novo a district court's grant of a Rule 12(c) motion for judgment on the pleadings. *Milwaukee Police Ass'n v. Flynn*, 863 F.3d 636, 640 (7th Cir. 2017). To survive a motion for judgment on the pleadings, "a complaint must state a claim to relief that is plausible on its face." *Id.* (quoting *Wagner v. Teva Pharm. USA, Inc.*, 840 F.3d 355, 358 (7th Cir. 2016)). "When assessing the facial plausibility of a claim, 'we draw all reasonable inferences and facts in

---

[21] *Id.* at 12.

favor of the non-movant, but need not accept as true any legal assertions.'" *Id.* (quoting *Wagner*, 840 F.3d at 358). At the Rule 12 motion stage, a plaintiff must support an allegation of bad faith with "subsidiary facts," not just "[b]are assertions of the state of mind." *Yeftich v. Navistar, Inc.*, 722 F.3d 911, 916 (7th Cir. 2013). Plaintiffs fail to state a claim of bad faith when their complaint contains nothing but "conclusory labels," such as that union officials had acted "invidiously" or "intentional[ly], willful[ly], wanton[ly], and malicious[ly]." *Id.* We have noted that a plaintiff's complaint might pass muster if it "offer[s] facts that suggest a motive for the union's alleged" bad-faith conduct. *Id.*

The Railway Labor Act and the Supreme Court decisions interpreting the collective bargaining obligations of parties under that statute provide the doctrinal anchor for our substantive analysis. Under the statute, when a union serves as the exclusive bargaining agent for a group of employees, it assumes a duty of fair representation. The Supreme Court has described this duty as an implied "statutory obligation to serve the interests of all members without hostility or discrimination toward any, to exercise its discretion with complete good faith and honesty, and to avoid arbitrary conduct." *Vaca v. Sipes*, 386 U.S. 171, 177 (1967).[22] This duty is grounded in the practical reality that employees give up

---

[22] The duty of fair representation was first "developed … in a series of cases involving … the Railway Labor Act" and, later, was "extended to unions certified under the N.L.R.A." *Vaca v. Sipes*, 386 U.S. 171, 177 (1967). Therefore, duty-of-fair-representation cases apply interchangeably to claims arising under either statutory scheme. *See, e.g., Air Line Pilots Ass'n, Int'l v. O'Neill*, 499 U.S. 65, 75–77 (1991).

their rights to bargain individually with their employers when they designate a union as their exclusive bargaining representative. Therefore, the statute imposes on the exclusive bargaining agent the duty of fair representation. The Supreme Court has likened this duty "to the duty owed by other fiduciaries to their beneficiaries." *Air Line Pilots Ass'n, Int'l v. O'Neill*, 499 U.S. 65, 74 (1991). It has further said that this duty applies equally to all aspects of union activity, not merely to a union's negotiations with employers. *Id.* at 77.

A union breaches the duty of fair representation if its actions are (1) arbitrary, (2) discriminatory, or (3) made in bad faith. *Id.* at 67. A plaintiff is successful in pleading a breach of the duty of fair representation if he plausibly pleads a breach under *any* of the three prongs. *See Rupcich v. United Food & Commercial Workers Int'l Union*, 833 F.3d 847, 854 (7th Cir. 2016). Therefore, each prong "must be considered separately in determining whether or not a breach has been [pleaded]." *Neal v. Newspaper Holdings, Inc.*, 349 F.3d 363, 369 (7th Cir. 2003).

The appropriate inquiry under each of these prongs is somewhat different. In determining whether a union acted arbitrarily, we employ "an objective inquiry," *Rupcich*, 833 F.3d at 854 (quoting *Neal*, 349 F.3d at 369), and must remain constantly mindful of the Supreme Court's admonition that "[a]ny substantive examination of a union's performance … must be highly deferential, recognizing the wide latitude that negotiators need for the effective performance of their bargaining responsibilities," *O'Neill*, 499 U.S. at 78. Therefore, under the "arbitrary" prong of the fair representation analysis, "the final product of the bargaining process may constitute evidence of a breach of duty only if it can be fairly

characterized as so far outside a 'wide range of reasonable-ness' that it is wholly 'irrational' or 'arbitrary.'" *Id.* (citation omitted) (quoting *Ford Motor Co. v. Huffman*, 345 U.S. 330, 338 (1953)).

The other two prongs of the fair representation analysis necessarily require a different approach. When we ask whether "a union's actions are discriminatory or in bad faith," there must be "proof that the union acted (or failed to act) due to an improper motive." *Neal*, 349 F.3d at 369. Such an inquiry calls for a subjective inquiry into the union's motives. *Id.* The case law recognizes that unions often must make decisions that distinguish among different categories of employees. In that situation, unions must represent "all the employees as a unit acting by majority vote," even though "each individual employee in the unit is a beneficiary of this collective action." *Garcia v. Zenith Elecs. Corp.*, 58 F.3d 1171, 1175 (7th Cir. 1995). This tension inherent in this obligation requires us to recognize when assessing claims of discrimination or bad faith that "[t]he interests of individual employees sometimes may be compromised for the sake of the larger bargaining collective." *Id.* at 1176.

Our obligation to recognize the tension caused by the union's concurrent obligations to its collective membership and to the individual members means that a claim of discrimination or bad faith must rest on more than a showing that a union's actions treat different groups of employees differently. A union member's claim must be based on more than the discriminatory *impact* of the union's otherwise rational decision to compromise. *See O'Neill*, 499 U.S. at 81 (noting that "some form of allocation was inevitable"). Instead, a claim of discrimination "requires proof that the union acted (or failed

No. 17-1438

to act) due to an *improper motive*." *Neal*, 349 F.3d at 369 (emphasis added).[23] If such an improper motive can be shown, it can taint a union's decision that otherwise would not constitute actionable discrimination or be considered arbitrary. We have said that "[a] union would act in bad faith if, for example, it disfavored members who supported a losing candidate for union office." *Cunningham v. Air Line Pilots Ass'n, Int'l*, 769 F.3d 539, 542 (7th Cir. 2014). "Deceptive actions" or "fraud" can be relevant to whether a union acted in bad faith. *Yeftich*, 722 F.3d at 916 (quoting *Humphrey v. Moore*, 375 U.S. 335, 348 (1964)).[24]

## B.

Having set forth the principles governing this appeal, we now apply those principles to the case before us.

We begin with the allegations of the plaintiffs' operative complaint. There, the plaintiffs allege that pilot instructors "represent[] only a small minority" of ALPA's membership and that "ALPA designed an allocation formula … designed to ensure that the members of … minority groups would re-

---

[23] *See also Schwartz v. Bhd. of Maint. of Way Employes*, 264 F.3d 1181, 1186 (10th Cir. 2001) (requiring plaintiffs to show not just that they "were treated differently than other employees" but "*why* [they] were treated differently—the crucial question for a duty of fair representation discrimination claim" (emphasis in original)).

[24] Another example of bad-faith conduct would be collusion between a union and an employer, "such as attempts by the union and management to conceal an agreement to not pursue [an employee's] arbitration." *Rupcich v. United Food & Commercial Workers Int'l Union*, 833 F.3d 847, 859 (7th Cir. 2016).

No. 17-1438                                                        17

ceive, at most, a fraction of their deserved retro pay."[25] They allege that the allocation was "irrational and discriminatory" and imposed for "[n]o good faith reason."[26] Finally, they allege that in applying an allocation formula that benefitted the line pilots at the expense of the pilot instructors, ALPA breached its duty of fair representation "by discriminating against, expressing hostility and acting with animosity towards [the pilot instructors] and arbitrarily choosing to disregard their interests in favor of the interests of the stronger, more politically favored majority."[27]

Later, in opposition to ALPA's Rule 12(c) motion, the plaintiffs submitted, and the district court considered, several exhibits that are consistent with the allegations in the complaint.[28] These exhibits included evidence that ALPA lied about having the support of the pilot instructors' union

---

[25] R.29 at 6.

[26] *Id.* at 12, 14.

[27] *Id.* at 21–22.

[28] It was proper for the district court to consider this evidence. Although a party *moving for dismissal* ordinarily converts a Rule 12 motion into a Rule 56 motion for summary judgment by attaching extrinsic materials to its motion, a party *opposing* a Rule 12 motion "has much more flexibility," and we (and the district court) may consider the additional materials as long as they are "consistent with the pleadings." *Geinosky v. City of Chicago*, 675 F.3d 743, 745 n.1 (7th Cir. 2012). In fact, under the more stringent pleading standards of *Ashcroft v. Iqbal*, 556 U.S. 662 (2009), and *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544 (2007), "a plaintiff who is opposing a Rule 12(b)(6) or Rule 12(c) motion and who can provide such illustration may find it prudent to do so." *Geinosky*, 675 F.3d at 745 n.1.

representative when it devised the formula and evidence that ALPA warned the pilot instructors not to complain about the formula lest they risk "repercussions" and "suffer[ing] the consequences."[29]

Here, we are confident that Mr. Bishop and Mr. Lish have sufficiently and plausibly pleaded that ALPA acted in bad faith in its allocation of retroactive pay between the line pilots and pilot instructors. A union may not make decisions "*solely* for the benefit of a stronger, more politically favored group over a minority group." *Barton Brands, Ltd. v. NLRB*, 529 F.2d 793, 798–99 (7th Cir. 1976) (emphasis in original). A union therefore breaches its duty of fair representation if it makes decisions "for no apparent reason other than political expediency." *Id.* at 800. The plaintiffs have alleged that pilot instructors make up a minority of ALPA's membership and that ALPA acted with the intent to appease its majority membership, the line pilots, after a lengthy and contentious CBA negotiation. Under our case law, this is an improper motive.[30]

---

[29] R.149-2 at 4.

[30] *See, e.g., Cunningham v. Air Line Pilots Ass'n, Int'l*, 769 F.3d 539, 542 (7th Cir. 2014) ("A union would act in bad faith if, for example, it disfavored members who supported a losing candidate for union office."); *Barton Brands, Ltd. v. NLRB*, 529 F.2d 793, 799–800 (7th Cir. 1976) (noting that a union may not make "decisions … *solely* for the benefit of a stronger, more politically favored group over a minority group" (emphasis in original)); *see also Addington v. US Airline Pilots Ass'n*, 791 F.3d 967, 984–85 (9th Cir. 2015) ("Decisions benefitting a majority of the group may not be made merely because the 'losers ha[d] too few votes to affect the outcome of an intra-union election.'" (alteration in original) (quoting

(continued … )

No. 17-1438                                                    19

Further, the plaintiffs have alleged that ALPA ignored Arellano's warnings about the effect of the allocation on pilot instructor pay and later lied about Arellano's having supported the allocation in an attempt to justify the pilot instructors' retroactive pay settlement. "Deceptive actions can be evidence of bad faith," *Yeftich*, 722 F.3d at 916, and the plaintiffs have plausibly pleaded that ALPA acted deceptively in its post-decision justifications for the allocation.

By plausibly pleading that ALPA acted with the improper motive of appeasing the majority-membership line pilots at the expense of the minority pilot instructors, the plaintiffs have met their burden of pleading not only that they "were treated differently than other employees" but "*why* [they] were treated differently—the crucial question for a duty of fair representation discrimination claim." *Schwartz*, 264 F.3d at 1186 (emphasis in original).

Because the plaintiffs have plausibly pleaded allegations of bad faith and discrimination, they are not required to negate ALPA's claim that it acted rationally and, therefore, not arbitrarily. First, we reiterate that in order to succeed on their duty of fair representation claim, the plaintiffs need only prove a breach under one of the prongs of the tripartite

---

( … continued)
*Rakestraw v. United Airlines, Inc.*, 981 F.2d 1524, 1530 (7th Cir. 1992));
*Ramey v. Dist. 141, Int'l Ass'n of Machinists & Aerospace Workers*, 378 F.3d 269, 277 (2d Cir. 2004) (noting that a union may not attempt "to punish a disfavored group," "prefer [one group of] workers based solely on [their loyalty] to the guild," or "punish a minority group within the union" (quoting *Teamsters Local Union No. 42 v. NLRB*, 825 F.2d 608, 612 (1st Cir. 1987) (alterations in original)).

analysis. *See Rupcich*, 833 F.3d at 854. Second, at this stage in the litigation, we are required to "take all well-pleaded allegations in the plaintiffs' pleadings to be true, and we view the facts and inferences to be drawn from those allegations in the light most favorable to the plaintiffs." *Alexander v. City of Chicago*, 994 F.2d 333, 336 (7th Cir. 1993). ALPA might well be able to prove later in the litigation that, as a factual matter, it did not act with the bad-faith motive that the plaintiffs have pleaded at this stage.

The district court disregarded the plaintiffs' allegations of bad faith and discrimination because it concluded that "the allocation was rational and not arbitrary, rendering irrelevant ALPA's subjective motivation."[31] In so holding, the district court relied on our decisions in *Rakestraw v. United Airlines, Inc.*, 981 F.2d 1524 (7th Cir. 1992), and *Cunningham*, 769 F.3d 539. ALPA similarly relies on *Rakestraw* and *Cunningham* to contend that "ALPA's motive for … equality of treatment is irrelevant" because ALPA's allocation decision was not arbitrary.[32] ALPA appears to read *Rakestraw* and *Cunningham* as establishing that, as long as ALPA can put forth a nonarbitrary, rational basis for its allocation methodology, the plaintiffs never can succeed on their claims based on bad faith and discrimination.

This broad reading of these two cases has several infirmities. First, in the case of *Rakestraw*, it ignores the significant difference in the procedural postures of the cases. *Rakestraw*

---

[31] R.189 at 12.

[32] Appellee's Br. 18–19.

had a substantially more developed record and did not turn on the adequacy of the pleadings.[33] *In Cunningham,* the issue of bad faith apparently was never actually at issue.[34] More fundamentally, in the years since these two cases, our court has acknowledged consistently the three independent inquiries required by the Supreme Court analysis under *O'Neill. E.g., Rupcich,* 833 F.3d at 854; *Yeftich,* 722 F.3d at 916; *Neal,* 349 F.3d at 369. The law of this circuit follows *O'Neill* and is compatible with the law of the other circuits. *See, e.g., Addington v. US Airline Pilots Ass'n,* 791 F.3d 967, 985 (9th Cir. 2015); *Carter v. United Food & Commercial Workers, Local No. 789,* 963 F.2d 1078, 1082 (8th Cir. 1992). Therefore, even if *Rakestraw* and *Cunningham* deviated from the national consensus, we found our way home long ago.

## Conclusion

The district court acted prematurely in crediting ALPA's allegation of rationality over the plaintiffs' well-pleaded allegations of bad faith and discrimination. In doing so, the district court deprived the plaintiffs of the opportunity to conduct discovery and develop a factual record to support their claims. Because the plaintiffs plausibly pleaded that ALPA acted with an improper motive in allocating the lump-sum retroactive pay settlement in a way that dispar-

---

[33] *Rakestraw* involved two consolidated cases. One was decided on a full summary judgment record; the other was decided after a full trial on the merits. *Rakestraw v. United Airlines, Inc.,* 981 F.2d 1524, 1527, 1529 (7th Cir. 1992).

[34] *See Cunningham,* 769 F.3d at 542 ("Plaintiffs do not accuse the Union" of "act[ing] in bad faith … .").

ately affected the pilot instructors, we reverse the judgment
of the district court and remand for further proceedings con-
sistent with this opinion.

REVERSED and REMANDED

No. 17-1438                                                    23

HAMILTON, *Circuit Judge*, concurring in the judgment. I agree with much of Judge Ripple's thoughtful opinion, but regretfully cannot join it in all respects. I agree with my colleagues that the dismissal of this case on the pleadings was premature. In my view, though, later dismissal on summary judgment or at trial seems likely once we focus on just how small a target plaintiffs must hit to prove a breach of the duty of fair representation.

We all agree that plaintiffs have not alleged a viable claim for "arbitrary" action by the union. See ante at 19. In *Air Line Pilots Ass'n v. O'Neill*, 499 U.S. 65, 67 (1991), the Supreme Court restated the established formula that a union may breach its duty of fair representation by taking action that is either (1) arbitrary, (2) discriminatory, or (3) in bad faith. On the arbitrary prong of the standard, *O'Neill* emphasized, as have many other cases, that when a union must decide how to balance competing interests of different members, the union may operate within a "wide range of reasonableness." *Id*.

In this case, the retroactive payment of $225 million for United legacy pilots presented a zero-sum negotiation within the union, at least if the allocation of that sum is viewed in isolation. But it would be a mistake for us to view this negotiation in isolation (and to let a jury view it in isolation). Perhaps the most striking feature of this case is that the plaintiffs themselves received *the largest* prospective raises under the new 2012 collective bargaining agreement. But plaintiffs also contend that they received "one of the biggest pay cuts" under the 2003 concessionary agreement in the United bankruptcy. Dkt. 149-2, at 2 (Casciano Aff.). Their complaint in this case is that they did not receive enough of the retroactive pay adjustment. We can be confident that every union officer and

virtually every union member was aware of that larger picture, and of the even longer history of United pilots' compensation since long before the Continental merger, the 2012 collective bargaining agreement, and the allocation of the United pilots' share of the retroactive payment. Different groups of pilots can use different baselines to gauge fairness and to reach diametrically opposite, yet all reasonable, conclusions.

The fairness of one transaction or allocation decision simply cannot be evaluated in isolation. In this situation, virtually any group will be able to identify past actions that "victimized" them. Federal labor law has long avoided trying to dictate the outcome of collective bargaining. That reluctance helps explain the highly deferential approach to union decisions when plaintiffs claim a decision was so arbitrary as to breach the duty of fair representation. See *O'Neill*, 499 U.S. at 74, 78 (affirming summary judgment for union); *Ford Motor Co. v. Huffman*, 345 U.S. 330, 338 (1953) (same); *Yeftich v. Navistar, Inc.*, 722 F.3d 911, 916 (7th Cir. 2013) (affirming dismissal). Against virtually any allocation decision a union might make, someone could make the same arguments plaintiffs make here. See ante at 16–17 (summarizing plaintiffs' arguments). The district court correctly dismissed this theory at the pleading stage.

We are remanding for further proceedings on plaintiffs' allegations that in allocating the retroactive pay sum among its members, the union acted for a discriminatory motive or in bad faith. I do not agree with my colleagues' statement of the applicable pleading standard regarding those states of mind. See ante at 13. Federal Rule of Civil Procedure 9(b), after requiring that fraud or mistake be alleged "with particularity," provides further: "Malice, intent, knowledge, and

other conditions of a person's mind may be alleged generally." The majority opinion says that such an allegation of bad faith must be supported with allegations of subsidiary facts, and that "bare assertions of the state of mind" are not enough. Ante at 13, quoting *Yeftich*, 722 F.3d at 916. In saying that, the majority opinion contributes to our circuit's decisions relying on *Ashcroft v. Iqbal*, 556 U.S. 662, 686–87 (2009), which has us drifting further and further away from Rule 9(b)'s express authorization that, apart from fraud or mistake, a defendant's state of mind may be alleged "generally." To my knowledge, we have not yet seen the efficiencies and cost savings promised, or at least hoped for, in *Iqbal*. See *id*. at 685. The principal effect of *Iqbal* seems to be only an extra layer of motions practice (and attorney fees) in vast numbers of civil cases. While I do not join the language of the majority opinion in this respect, I still agree that at the pleading stage, these plaintiffs have alleged sufficiently the subjective states of mind—discriminatory and acting in bad faith.

The more difficult problem in this case, and in the field of unions' duty of fair representation generally, is what should count as bad faith or discrimination? The answer is that not much should count, and a jury should be instructed accordingly. The principle of majority rule is at the core of American labor law. We should not be surprised if union leaders opt for the greatest good for the greatest number, and we should not step in to protect union minorities from majority rule except in narrow classes of cases.

The district court looked at the Supreme Court's decision in *O'Neill* and our precedents, including *Rakestraw v. United Airlines, Inc.*, 981 F.2d 1524 (7th Cir. 1992), and *Cunningham v. Air Line Pilots Ass'n*, 769 F.3d 539 (7th Cir. 2014), which all held

that this same defendant union did *not* breach its duty of fair representation in similarly painful zero-sum allocations among union members. Based on those opinions, Judge Feinerman reached the understandable conclusion that subjective intentions did not matter, at least as long as the union's decision on allocation of the retroactive pay was not arbitrary.

We explained in *Rakestraw* that the duty of fair representation prevents a union from punishing political opponents of union leaders or another minority "for no reason other than that the losers have too few votes to affect the outcome of an intra-union election," or based on race, sex, or other legally forbidden grounds. 981 F.2d at 1530. But in *Rakestraw* we also warned of the ease with which difficult allocation decisions can be described as arbitrary, discriminatory, or in bad faith, at least if those terms are understood broadly:

> The same acts may be characterized as "bad faith" efforts to take a perquisite away from one group, or as normal efforts to provide a level playing field for all workers. Slogans can be mustered on all sides.
>
> So we are back to the beginning. Bargaining has winners and losers. A better retirement plan and other deferred compensation helps older workers at the expense of younger ones, who prefer cash to cover current expenses. Accepting lower fringe benefits (less health insurance, fewer days off) in exchange for higher cash wages helps the majority at the expense of the sick and those whose religious faith requires them to take extra days off. Higher wages assist those who remain with the firm at the expense

of workers who may be laid off when the employer loses business to its competitors. Reducing the difference between the wages of skilled and unskilled workers assists the less skilled, who also tend to be more numerous. Unless its leaders are unfathomably dense, the union knows who wins and who loses. *The losers always may say that the union "intended" them to lose.* As all of society is an assembly of minorities, *the losers can point to some respect (age, sex, religion, politics, skill, health, membership in the union, status during the most recent strike) in which they are in a minority, and insist that the distinction must have been part of a "bad faith" plot to "penalize" them on account of that status.* Taken to its limits, the approach prevents the union from resolving differences internally and representing the interests of workers as a group. Yet one of the premises of the Railway Labor Act (like the National Labor Relations Act), and a requirement of the Labor-Management Reporting and Disclosure Act, is that unions act democratically to reach a collective decision—the majority is entitled to prevail.

981 F.2d at 1530–31 (citations omitted, emphasis added).

Drawing on *O'Neill*'s comparison to judicial review of statutes, we added in *Rakestraw*: "Slapping the label 'bad faith' or 'discrimination' on a classification that is rationally related to a legitimate objective does not alter the analysis. A discriminatory motive without a discriminatory rule does not condemn a statute." *Id*. at 1532. And the same applies to union

allocation decisions: "For the reasons developed in Part II of this opinion, however, a 'bad' motive does not spoil a collective bargaining agreement that rationally serves the interests of workers as a whole . . . ." *Id*. at 1535.

Similarly, we pointed out in *Cunningham* that the kind of discrimination alleged there (favoring pilots of one merging airline over those of another) was not the sort of discrimination courts are worried about. 769 F.3d at 542. *Cunningham* noted that "some form of allocation [between competing groups of pilots] was inevitable. A rational compromise on the initial allocation was not invidious 'discrimination' of the kind prohibited by the duty of fair representation." *Id*. at 542, quoting *O'Neill*, 499 U.S. at 81.

My colleagues portray *Rakestraw* and *Cunningham* as out of step with *O'Neill* and other Seventh Circuit cases, but that view is not persuasive. Both *Rakestraw* and *Cunningham* leave a little room to consider subjective motives, such as in discrimination cases involving race, sex, or other legally prohibited reasons, and in bad faith cases where plaintiffs can show the union leaders' *sole* motive was to punish their political opponents. 981 F.2d at 1530; 769 F.3d at 542. But expanding the realm of discriminatory or bad faith actions much beyond those narrow categories runs into *O'Neill*'s broad deference to union leaders in solving intractable problems in distributive justice.

The majority views *Rakestraw* and *Cunningham* as contrary to *O'Neill*, but I do not think that is correct, at least if we pay close attention to what actually happened in the relevant cases, and not just to what the courts' opinions said. The majority cites several cases to show that we have "found our way home" from *Rakestraw* and *Cunningham*, but the cited cases do

No. 17-1438                                                        29

not really show that. See ante at 21. In each of the cited cases, the *union won* on the claims of bad faith and discrimination. See *Rupicich v. United Food & Commercial Workers Int'l Union*, 833 F.3d, 847, 854–59 (7th Cir. 2016) (union arbitrarily refused to pursue arbitration of plaintiff's grievance, but union did not act in bad faith); *Yeftich*, 722 F.3d at 916 (affirming dismissal on pleadings); *Neal v. Newspaper Holdings, Inc.*, 349 F.3d 363, 369 (7th Cir. 2003) (holding that union did not act in bad faith or with discriminatory motive). Opinions explaining why unions won should not be read as expanding unions' potential liability.

My colleagues write that it would be an improper motive for the union to have acted "with the intent to appease its majority membership, the line pilots, after a lengthy and contentious CBA negotiation." Ante at 18. Taken by itself, that one sentence does not capture the applicable law. The cases cited to support it show that plaintiffs in fact must hit a much smaller target here. In *Barton Brands v. N.L.R.B.*, we wrote that a union breaches its duty of fair representation if it makes decisions "for *no* apparent reason other than political expediency," and that a union may not make decisions "*solely* for the benefit of a stronger, more politically favored group over a minority group." 529 F.2d 793, 799–800 (7th Cir. 1976) (first emphasis added; second in original).

The cited decisions from other circuits similarly required plaintiffs to show that a union acted solely for an improper purpose. *Addington v. US Airline Pilots Ass'n*, 791 F.3d 967, 984–85 (9th Cir. 2015) ("Decisions benefitting a majority of the group may not be made merely because the 'losers ha[d] too few votes to affect the outcome of an intra-union election.'"), quoting *Rakestraw*, 981 F.2d at 1530; *Ramey v. District 141, Int'l*

*Ass'n of Machinists & Aerospace Workers*, 378 F.3d 269, 277 (2d Cir. 2004) (union may not attempt "to punish a disfavored group," "prefer [one group of**]** workers based *solely* on [their loyalty to the guild]," or **"**punish a minority group within the union") (emphasis added). I trust the district judge will apply this high standard at summary judgment or trial.

In the end, this case will need to be decided on the basis of facts rather than pleadings. Though plaintiffs have barely cleared the pleading standard here, they will have a difficult time proving what they need to prove on the merits. The evidence of bad faith proffered so far—different accounts of the role of the instructor pilots' representative in the allocation negotiations—looks a lot less like bad faith and more like differences in "spin" about a difficult decision bound to disappoint everyone in varying degrees.

CERTIFIED COPY

A True Copy
Teste:

Deputy Clerk
of the United States
Court of Appeals for the
Seventh Circuit