UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | | |
|---|---|---|
| DAVID BISHOP and ERIC LISH, individually and on behalf of all others similarly situated, | ) ) | |
| | ) | 13 C 6243 |
| Plaintiffs, | ) | |
| | ) | Judge Gary Feinerman |
| vs. | ) | |
| | ) | |
| AIR LINE PILOTS ASSOCIATION, INTERNATIONAL, | ) ) | |
| | ) | |
| Defendant. | ) | |

**MEMORANDUM OPINION AND ORDER**

Three United Airlines management pilots and two United pilot instructors brought this suit against Air Line Pilots Association, International ("ALPA"), alleging that it breached its duty of fair representation under the Railway Labor Act ("RLA"), 45 U.S.C. § 151 *et seq*., by unfairly allocating retroactive pay funds among its membership in a manner that favored line pilots over management pilots and pilot instructors. Doc. 29. Plaintiffs moved to certify two subclasses, one for management pilots and the other for pilot instructors, Doc. 47, and ALPA moved under Civil Rule 12(c) for judgment on the pleadings, Doc. 132. As to the management pilots, the court denied ALPA's Rule 12(c) motion and granted Plaintiffs' class certification motion, and as to the pilot instructors, the court granted ALPA's motion and denied Plaintiffs' motion as moot. Docs. 188-191 (reported at 141 F. Supp. 3d 836 (N.D. Ill. 2015) and 310 F.R.D. 551 (N.D. Ill. 2015)). The management pilot class and ALPA reached a settlement, which the court approved, and the court entered judgment against the two pilot instructor plaintiffs, David Bishop and Eric Lish. Docs. 249-250.

The pilot instructors appealed, and the Seventh Circuit reversed and remanded. 900 F.3d 388 (7th Cir. 2018). This court then granted Bishop and Lish's motion to certify a pilot instructor class. Docs. 311-312 (reported at 331 F.R.D. 481 (N.D. Ill. 2019)). ALPA now moves for summary judgment. Doc. 346. The motion is granted.

### Background

The court recites the facts as favorably to Plaintiffs as the record and Local Rule 56.1 permit. *See Johnson v. Advoc. Health & Hosps. Corp.*, 892 F.3d 887, 893 (7th Cir. 2018). At this juncture, the court must assume the truth of those facts, but does not vouch for them. *See Gates v. Bd. of Educ. of Chi.*, 916 F.3d 631, 633 (7th Cir. 2019). Because the court grants summary judgment to ALPA, it does not expressly note the numerous instances in which it resolves genuine factual disputes in Plaintiffs' favor or overrules ALPA's objections to evidence adduced by Plaintiffs. Familiarity with this court's and the Seventh Circuit's prior opinions in this case is presumed.

### A.     Overall Summary

In 2003, when United was in bankruptcy, United and ALPA—the certified representative of United pilots—negotiated a "highly concessionary" collective bargaining agreement ("2003 UPA") that imposed wage and benefit cuts. Doc. 353 at ¶¶ 5-6, 35; Doc. 358 at ¶ 4. Under the RLA, a collective bargaining agreement does not expire at the end of its term but rather becomes "amendable," and employees must continue to work under the old agreement until a new one is negotiated. Doc. 353 at ¶¶ 5-6; s*ee Air Line Pilots Ass'n, Int'l v. UAL Corp.*, 897 F.2d 1394, 1398 (7th Cir. 1990) ("The [RLA] abhors a contractual vacuum. If on the date of expiration the parties have not negotiated a replacement agreement … the old agreement continues in force."). The 2003 UPA became amendable on January 1, 2010, and United pilots continued to work under it while ALPA and United negotiated a new agreement. Doc. 353 at ¶ 6.

Later in 2010, United merged with Continental Airlines. *Id*. at ¶ 5. ALPA was the certified representative of pre-merger Continental pilots as well. *Ibid*. On December 18, 2012, after nearly three years of negotiations, United and ALPA concluded a new collective bargaining agreement ("2012 UPA") that covered both pre-merger pilot groups. *Id*. at ¶¶ 2, 5, 7; Doc. 314 at ¶ 1. The pilots had hoped that the 2012 UPA would include around $1 billion in retroactive pay (sometimes called "retro pay" or just "retro") for the extra three years they had worked under the 2003 UPA. Doc. 358 at ¶ 1. ALPA managed to obtain only $400 million, however, which only partially compensated what pilots might have earned during the negotiation period. Doc. 353 at ¶ 11. On November 5, 2012, an arbitrator allocated $225 million of that total to the pre-merger United pilots, with the remaining $175 million going to the pre-merger Continental pilots. *Id*. at ¶ 12; Doc. 354-2 at 5.

Most United pilots are "line pilots," who work flying passengers from one location to another. Doc. 314 at ¶ 19. Pilot instructors, by contrast, train other pilots, Doc. 349-1 at 10 (79:25-80:2), and work in a single location at United's training center in Denver, Doc. 353 at ¶ 15. United's over 100 pilot instructors comprise only a small fraction of all United pilots. Doc. 314 at ¶ 41. Pilot instructors may choose to "return to the line"—in other words, to resume line pilot duties—whenever they wish. Doc. 353 at ¶ 18. The reverse is not true, as there is an application process to become a pilot instructor. Doc. 349-4 at 3 (7:7-16).

Under both the 2003 and 2012 UPAs, line pilots were paid by the hour, with each pilot assigned an hourly wage rate based on three variables: type of aircraft flown ("fleet"); rank in that aircraft ("seat"); and length of time since the pilot was hired ("longevity"). Doc. 353 at ¶ 14; Doc. 358 at ¶ 2. Both UPAs set an hourly rate for each fleet-seat-longevity combination, and line pilots were paid at that rate for the number of hours they were credited. Doc. 358 at ¶ 2; *see*

Doc. 149-3 at 36-41 (wage tables for the 2003 UPA); *id*. at 72-77 (wage tables for the 2012 UPA). The number of hours credited was not a matter of simple timekeeping, as several "work rules" governed the calculation of credit hours. Doc. 359-4 at 3 (23:12-24:19). Some of the work rules were set forth in Section 3 of the 2003 and 2012 UPAs. Doc. 149-3 at 36-55, 72-86; *see* Fed. R. Civ. P. 56(c)(3) (providing that a court "may consider" the entire record in deciding a summary judgment motion).

Most significant here, the 2003 and 2012 UPAs both established a minimum number of "pay credit" hours a line pilot would receive per month. Doc. 149-3 at 44, § 3-B-8; *id*. at 79, § 3-C. Under the 2003 UPA, the absolute "minimum guarantee" was 65 hours per month for ordinary line pilots. *Id*. at 43, § 3-B-7-a. For reserve line pilots, who are on call to fill in for other line pilots 18 days per month, the minimum guarantee was 70 hours. *Ibid*.; Doc. 359-4 at 28 (195:5-10). In addition, each "assigned line" was associated with a "Pay Credit Value," which set another, potentially higher minimum guarantee. Doc. 149-3 at 43, § 3-B-7-b. Finally, a third figure called "Protected Time Credit" took account of various schedule changes to calculate the number of credit hours. *Id*. at 44, § 3-B-8-a-(3).

The 2012 UPA contained similar but not identical provisions. *Id*. at 79, § 3-C. Under the 2012 UPA, the "Minimum Pay Guarantee" could be as high as 70 hours for line pilots—a five-hour increase from the 2003 UPA—though the number was adjusted for vacation days and unpaid absences. *Id*. at 79, § 3-C-1-a. The reserve pilots' guarantee rose from 70 hours to 73 hours, again depending on how many days they were on call and other adjustments. *Id*. at 79, § 3-C-1-b; Doc. 353-1 at 28 (5:9-11). Like the 2003 UPA, the 2012 UPA calculated a final figure called "Protected Time Credit" to account for various schedule changes. Doc. 149-3 at 80, § 3-C-2. The precise details of these provisions are not material. What is material, and not

subject to dispute, is that line pilots won various changes in the 2012 UPA that gave them a higher number of minimum guaranteed hours per month.

Pilot instructors' compensation under the 2003 and 2012 UPAs was more akin to a salary, though their salary turned in part on the fleet-seat-longevity rubric used to calculate hourly wage rates for line pilots. Under the 2003 UPA, pilot instructors were paid *as if* they were first officers in a 757/767 class aircraft, with six years of longevity, working 89 hours per month. Doc. 353 at ¶¶ 9, 15-16; Doc. 358 at ¶ 6; Doc. 354-1 at 116, § 5-A. Under the 2012 UPA, pilot instructors were paid *as if* they were first officers in a 777/787 class aircraft, with nine years of longevity, working 90 hours per month. Doc. 353 at ¶ 9; Doc. 354-1 at 132, § 23-L-1-b. The parties refer to this salary calculation method as the pilot instructors' "pay cap." Doc. 353 at ¶¶ 15-16; Doc. 358 at ¶ 6. Pilot instructors could earn extra pay through line flying and "override" pay, so they were not purely salaried. Doc. 354-1 at 130, § 23-K; *id*. at 132, § 23-L-2. But it is undisputed that the capped salary was the most important part of their compensation. Doc. 358 at ¶ 3. As compared to line pilots (and management pilots), pilot instructors received—due to the increased pay cap—by far the largest percentage pay increase in the 2012 UPA. Doc. 353 at ¶¶ 8-10.

Returning to the issue of retroactive pay, the United pilots' elected leadership, known as the United Master Executive Council ("MEC"), was responsible for allocating the $225 million among the pre-merger United pilots. Doc. 353 at ¶ 13; Doc. 358 at ¶ 1. The MEC tasked one of its subcommittees, Subcommittee 2, with proposing an allocation formula. Doc. 353 at ¶¶ 21-22. Subcommittee 2 had five members: Robert Fox, a line pilot and subcommittee chair; Mark Arellano, a pilot instructor; and three other line pilots. Doc. 358 at ¶ 10. At that time, Arellano was chair of the pilot instructors' local union council and held an MEC seat, and in those

capacities served as the elected representative of pilot instructors' interests within ALPA during negotiations over the 2012 UPA and the retroactive pay formula. Doc. 353 at ¶ 25; Doc. 358 at ¶ 7; Doc. 354-1 at 61 (56:8-12). Another pilot instructor, Thomas Brinton, participated in Subcommittee 2's deliberations as a non-voting member. Doc. 353 at ¶ 26.

Subcommittee 2 ultimately proposed a retroactive pay formula that, as for hourly wage rates, used as a comparator the collective bargaining agreement ratified in 2010 by Delta Air Lines pilots ("2010 Delta CBA"). *Id*. at ¶ 33. The parties agree that, as to the hourly rates applicable to each fleet-seat-longevity combination, the 2010 Delta CBA was a reasonable comparator for the retroactive pay period because Delta and United were competitors that had both gone through bankruptcy. *Id*. at ¶¶ 35-37. But the parties dispute which *non-hourly rate* contract terms *should* have been used to calculate retroactive pay. As described above, the pilot instructors had won substantial and favorable changes to their pay cap in the 2012 UPA. *Id*. at ¶ 9. Would those changes be accounted for in the retroactive pay formula? And would any non-hourly rate gains made by line pilots in the 2012 UPA be accounted for? Subcommittee 2 proposed not to do so—that is, to hold constant in the retroactive pay formula every component of the 2003 UPA except for the hourly wage rate tables, which would be taken from the 2010 Delta CBA. *Id*. at ¶¶ 32-34; Doc. 358 at ¶¶ 12, 15; Doc. 354-2 at 6-17.

Specifically, Subcommittee 2's proposal was to calculate a "Delta Differential" for each "Retro Pay Hour" a pilot had worked during the "Retro Pay Period" from January 1, 2010 to December 17, 2012. Doc. 354-2 at 6, § B.7-.9. For each Retro Pay Hour, the Delta Differential equaled the difference between a minuend—the pilot's hypothetical wage at the 2010 Delta CBA's hourly wage rates under the 2003 UPA's non-hourly rate terms—and a subtrahend—the pilot's actual wage rate during the retroactive pay period under the 2003 UPA. *Id*. at 6, § B.9.

Each hourly Delta Differential was calculated using "the same combination of seat, fleet, and longevity" in both the minuend and the subtrahend. *Ibid*. That combination was "determined by [the pilot's] Category … for the [Retro Pay] Hour involved," with Category defined as the "domicile, fleet, and seat combination … to which a pilot is assigned." *Id*. at 6, § B.4-.5, .9. In other words, the combination for each Retro Pay Hour was simply the status the pilot had held at the time under the 2003 UPA. Likewise, for pilot instructors specifically, hourly Delta Differentials were calculated using the 2003 UPA's pay cap terms: "767/757 First Officer with 6 yr longevity." *Id*. at 7, § C.2.

Another issue was how many of those Retro Pay Hours, and corresponding Delta Differentials, each pilot would be credited with during the Retro Pay Period. For line pilots, the proposal used "the higher of Protected Time Credit (PTC) or Time Credit (TCR)." *Id*. at 7, § C.1.a. "Protected Time Credit" referred to the minimum hour guarantee for line pilots set forth in § 3-B-8 of the 2003 UPA. Doc. 149-3 at 44. So, the line pilots simply received credit for the number of hours they worked during the Retro Pay Period according to 2003 UPA rules. Doc. 353 at ¶ 32; Doc. 358 at ¶ 12. For pilot instructors, the number of Retro Pay Hours was fixed at 89 hours per month, which again mirrored the pay cap provision from the 2003 UPA. Doc. 354-2 at 7, § C.2; Doc. 354-1 at 116, § 5-A.

A wage table set forth the Delta Differentials for each type of Retro Pay Hour under these rules. Doc. 354-2 at 13. The sum of a pilot's Retro Pay Hours multiplied by each corresponding hourly Delta Differential was defined as that pilot's "Individual Pilot Delta Differential." *Id*. at 7, § B.10. Note that the formula thus used the term "Delta Differential" in two distinct senses: first to refer to hourly wage rate differences, and then to refer to the sum of those differences over the entire Retro Pay Period.

Compensating the full Individual Pilot Delta Differential for every United pilot would have required far more than $225 million. Doc. 354-1 at 153 (169:21-171:3). So Subcommittee 2 proposed to allocate the available funds on a pro rata basis. Doc. 353 at ¶ 34. Retroactive pay was awarded in proportion to a pilot's Individual Pilot Delta Differential over the sum of all pilots' differentials (termed the "Pilots' Collective Delta Differential"). Doc. 354-2 at 7, § B.11-.14; *id*. at 11-12 (setting forth this calculation process in a flow chart).

The MEC reviewed and approved Subcommittee 2's proposal, and ALPA's membership then ratified the formula alongside the 2012 UPA as Letter of Agreement 24 ("LOA 24"). Doc. 353 at ¶¶ 44-45. Thus, in the end, the only provision from the 2010 Delta CBA that affected retroactive pay awards was the one setting hourly wage rates; all non-hourly rate terms were carried over unchanged from the 2003 UPA. Doc. 355 at 18 ("[T]he 'rule' that was supposedly applied 'uniformly' was based solely on the hourly rates under the Delta contract … .").

Plaintiffs allege that the allocation formula substantially disadvantaged pilot instructors as compared to line pilots. For line pilots, whose compensation is more closely tied to the hourly wage rate tables, retaining the 2003 UPA's non-hourly rate terms omitted only the relatively minor gains they won in the 2012 UPA. For pilot instructors, leaving in place the 2003 UPA's pay cap had a greater impact. As addressed below, pilot instructors would have received larger shares of the $225 million retroactive pay pot had the 2010 Delta CBA's *non*-hourly rate pay provision for pilot instructors, rather than the 2003 UPA's pay cap, been used to calculate their Delta Differential minuends and number of Retro Pay Hours. Doc. 353 at ¶ 40.

Most of the United pilot instructors challenged the retroactive pay allocation formula through ALPA's dispute resolution process. Doc. 358 at ¶ 21; Doc. 359-3 at 17 n.39. The

ALPA Executive Council—a central governing body with representatives from all ALPA-represented carriers, Doc. 170 at ¶ 11—rejected the challenges. Doc. 359-3 at 9-10. The pilot instructors appealed to an arbitrator, who denied the appeal in May 2013 after conducting hearings from April 16-18, 2013. *Id*. at 9-11, 17-20, 30; Doc. 354-1 at 142-156.

This suit was filed shortly after arbitrator's decision. Doc. 1. As noted, only the pilot instructor class's claim remains, and they allege that ALPA adopted the LOA 24 retroactive pay formula to benefit the line pilots at the expense of the pilot instructors, thereby breaching its RLA duty of fair representation to pilot instructors. Doc. 29 at ¶¶ 76-80. Specifically, Plaintiffs allege that ALPA breached that duty "by discriminating against, expressing hostility and acting with animosity towards [the pilot instructors] and arbitrarily choosing to disregard their interests in favor of the interests of the stronger, more politically favored majority … in its misallocation of the retro pay." *Id*. at ¶ 79. Similarly, in opposing summary judgment, Plaintiffs argue that "Subcommittee 2 was not motivated by 'equal' treatment, but rather out of a desire to reduce the pilot instructors' retro pay for no valid union purpose." Doc. 355 at 20.

### B. Impact of the LOA 24 Formula on Pilot Instructors

Plaintiffs' quarrel with the LOA 24 formula is that it used the 2003 UPA's pay cap to calculate the minuend of their Delta Differentials and their number of Retro Pay Hours. *Id*. at 11-13, 20. A declaration submitted by Plaintiffs' counsel calculates two alternative damage models: one that substitutes the 2010 Delta CBA's non-hourly rate pay provision for pilot instructors, and a second that substitutes the 2012 UPA's pay cap, in place of the 2003 UPA's pay cap. Doc. 354-2 at 32, ¶ 3 & n.1. But Plaintiffs elsewhere make clear that their position is that the 2010 Delta CBA's non-hourly rate pay provision for pilot instructors should have been used. Doc. 354 at ¶ 19 (asserting that ALPA should have "used the Delta Contract to calculate retro pay"); Doc. 355 at 4 (arguing that ALPA failed to "use the pay provision applicable to

Delta pilot instructors to calculate retro pay"); *id.* at 19-20 (arguing that "had ALPA truly applied the Delta contract 'uniformly,' pilot instructors and line pilots would have both received a nearly identical percentage of lost retro pay"). Although it does not affect the ultimate outcome of ALPA's summary judgment motion, the court will focus on that alternative.

The 2010 Delta CBA had no analog of the pilot instructors' pay cap in the 2003 and 2012 UPAs. Rather, the 2010 Delta CBA's non-hourly rate pay provision for pilot instructors stated that a Delta pilot instructor was "paid at the applicable composite hourly rate in the highest paying position he can hold," either as a captain or a first or second officer. Doc. 354-2 at 30, § 11.C.13.a-.b. Delta pilot instructors were guaranteed a minimum of 75 hours per month and capped at 110 hours per month. *Id.* at 30, § 11.C.13.c. Delta pilot instructors thus did not work under a pay cap akin to the United seat-fleet-longevity caps. Their compensation more closely resembled that of United line pilots: an hourly wage rate determined by the wage tables coupled with a minimum hour guarantee.

The proposed damage model that Plaintiffs favor, then, would have eliminated any pay cap for pilot instructors during the Retro Pay Period and simply applied "the pay formula for pilot instructors under the [2010 Delta CBA]." *Id.* at 32, ¶ 3. It is undisputed that pilot instructors received a total of about $4 million in retroactive pay under the LOA 24 formula, and that they would have received about $10.25 million under Plaintiffs' alternative methodology. *Id.* at 32, ¶ 2; *id.* at 33, ¶ 5; *id.* at 37.

What remains in dispute is Plaintiffs' submission that line pilots received a larger percentage of what they should have received during the Retro Pay Period—what Plaintiffs call "actual retro pay"—than did pilot instructors. Plaintiffs assert that, under the LOA 24 formula, "line pilots received approximately 38% of their actual retro pay," while pilot instructors

10

"received approximately 15% of their actual retro pay." Doc. 354 at ¶ 18. Plaintiffs further assert that, "[h]ad ALPA used the Delta Contract to calculate [the non-hourly rate aspects of] retro pay for United pilot instructors," they "would have received approximately 38% of their actual retro pay," eliminating the disparity. *Id*. at ¶ 19.

ALPA correctly disputes these figures, Doc. 358 at ¶¶ 18-19, as the evidence cited by Plaintiffs does not support what they claim to be the percentage disparities in "actual retro pay." The only evidence Plaintiffs cite is the testimony of pilot instructor Gerald Elwell at the April 2013 arbitration hearing. Doc. 354 at ¶ 18; *see* Doc. 354-1 at 151-155. Elwell's testimony is difficult to parse—indeed, at one point, he apologized to the arbitrator for "not doing a very good job explaining this" and "really messing this up bad." Doc. 354-1 at 154 (174:6-11). Nevertheless, it is clear from his testimony that the 38- and 15-percent figures were percentages of a version of "actual retro pay" that Plaintiffs do not press at this juncture, one that used both the 2012 UPA's pay cap and the 2012 UPA's hourly wage rates to formulate the correct baseline. In contrast, both damage models set forth in Plaintiffs' counsel's declaration use the 2010 Delta CBA's hourly wage rates, and the one model they favor in opposing summary judgment uses the 2010 Delta CBA's non-hourly rate pay provision for pilot instructors. Doc. 354-2 at 32, ¶ 3 & n.1. Yet Elwell did not consider *any* alternative retroactive pay allocation based on the 2010 Delta CBA's non-hourly rate pay provision, so his testimony sheds no light on the comparison that Plaintiffs now urge.

Elwell began his testimony by positing a hypothetical United line pilot, a 747 Captain with 12 years of longevity, who worked 1,000 hours per year. Doc. 354-1 at 152 (166:4-10). He calculated two different differentials for this pilot. The first was the Delta Differential, as defined by LOA 24, which came out to $75,049 over three years. *Id*. at 153 (169:21-170:1). The

second was a differential based not on the 2010 Delta CBA's hourly wage rates, but rather on the 2012 UPA's hourly wage rates. *Id*. at 152-153 (168:18-169:6). Elwell testified that the total differential for the hypothetical pilot "under the United pilot agreement" would have been $127,551 over three years. *Id*. at 153 (170:2-3). Neither of Elwell's figures for this line pilot reflected any of the 2010 Delta CBA's *non*-hourly rate pay provisions, and neither corresponds to either of the damage models presented in Plaintiffs' counsel's declaration.

Elwell next asserted that he had performed similar calculations for all the *actual* United pilots, adding up their differentials to calculate these two versions of "actual retro pay." Fully compensating every pilot's Delta Differential, he concluded, would have required "roughly $350 million." *Ibid*. (171:1-2). Because the MEC had only $225 million to distribute, the pilots on average recovered just "66 percent" of their Delta Differentials. *Ibid*. (171:3-4). ($225 million divided by 66 percent is actually about $341 million; Elwell apparently rounded up to $350 million in his testimony.) The ratio to the total 2012 UPA differential was worse. Summing all United pilots' 2012 UPA differentials, Elwell calculated that the pilots had collectively deserved "$596 million." *Ibid*. (171:14-17). Elwell then observed that $225 million represented a mere 38 percent of that version of actual retroactive pay. *Ibid*. (172:9-10). It is thus clear that, when Elwell spoke of line pilots getting 38 percent of what they deserved, he was assuming that pilots' hourly wage rates for retroactive pay should have been based on the 2012 UPA, a view that Plaintiffs do not press at this juncture. Doc. 354-2 at 32, ¶ 3 n.1. And again, neither of Elwell's models used the 2010 Delta CBA's non-hourly rate pay provisions.

Plaintiffs also assert that pilot instructors "received approximately 15% of their actual retro pay." Doc. 354 at ¶ 18. Elwell derived this figure, too, using the 2012 UPA's wage rates and pay cap—not the 2010 Delta CBA's wage rates and non-hourly rate pay provision for pilot

instructors. He first identified the hourly wage rate for a "777 FO nine year," which describes the 2012 UPA's pay cap. Doc. 354-1 at 154 (173:8); *id*. at 132, § 23-L-1-b. That hourly rate was $155.38 per hour. *Id*. at 154 (173:10-13); Doc. 149-3 at 72 (wage table for the 2012 UPA corroborating Elwell's testimony). Elwell then calculated the difference between what he, as an emblematic pilot instructor, would have earned at $155.28 per hour during the Retro Pay Period and what he in fact earned, which came out to $177,493. Doc. 354-1 at 154 (173:20-22). But, Elwell asserted, he had received only $26,000 in retroactive pay, a mere 15 percent of $177,493. *Ibid*. (174:17-20). He summarized his findings this way: "everybody else is getting 38 percent of what they would have gotten had [ALPA] used *the United pilot agreement* for a benchmark. Had [ALPA] used *the United pilot agreement* for a benchmark for the pilot instructors, we only get 15 percent." *Id*. at 155 (177:1-5) (emphasis added). Thus, when Elwell spoke of pilot instructors getting 15 percent of what they deserved, he was assuming that retroactive pay should have been based on 2012 UPA's hourly wage rates and the 2012 UPA's pay cap—again, a view that Plaintiffs now do not press. Doc. 354 at ¶ 19; Doc. 354-2 at 32, ¶ 3 n.1; Doc. 355 at 19-20.

In contrast to the disparity revealed by comparing pilots' actual retroactive pay awards to hypothetical awards under the 2012 UPA's hourly rates and non-hourly terms, Elwell testified that line pilots and pilot instructors received the same percentage of their full Delta Differentials. As noted, he explained that, based on the "Delta pilot working agreement," all pilots on average would be "getting roughly 66 percent" of what they deserved. Doc. 354-1 at 153 (171:3-13). He then calculated his own Individual Pilot Delta Differential, which came out to $40,693. *Id*. at 153-154 (172:20-173:3). Multiplying this figure by 66 percent yielded $26,857, close to the $26,000 he actually received. *Id*. at 154 (173:4-6). So, Elwell testified that the LOA 24 formula discounted both pilot instructors' and line pilots' deserved retroactive pay by 66 percent.

Elwell did not address a third issue on which Plaintiffs need evidence: the impact of Subcommittee 2's decision not to use the 2010 Delta CBA's *non*-hourly rate pay provision for pilot instructors. That alternative formula—which, as noted, Plaintiffs now promote, Doc. 355 at 19-20—would have compensated pilot instructors as if they were line pilots in their highest eligible position during the Retro Pay Period, Doc. 354-2 at 30, § 11.C.13.a-.b. Elwell did not perform the individualized calculations necessary to assess such a methodology; rather, his testimony gave the same figures for every pilot instructor, using his own retroactive pay situation as representative of all pilot instructors. Doc. 354-1 at 154 (173:2-174:22). Elwell's testimony therefore does not support Plaintiffs' numerous assertions that substituting the 2010 Delta CBA's non-hourly rate pay provision reveals a disparity of 38 percent to 15 percent between line pilots and pilot instructors. Doc. 354 at ¶¶ 18-19; Doc. 355 at 4, 12, 19-20, 24, 29.

In short, Plaintiffs mismatch a legal argument based on a comparison to the 2010 Delta CBA's hourly wage rates and non-hourly rate pay provision with factual support based on a comparison to the 2012 UPA's hourly wage rates and pay cap. Plaintiffs' counsel's declaration repeats the claim that $4 million corresponded to only 15 percent of pilot instructors' deserved pay, but the declaration does not provide any support for that figure beyond Elwell's testimony. Doc. 354-2 at 33 n.2. Therefore, although the evidence adduced by Plaintiffs shows that they would have received about $6.25 million more if the retroactive pay formula had used the 2010 Delta CBA's non-hourly rate pay provision for pilot instructors, they fail to adduce evidence that the LOA 24 formula gave them 15 percent shares of the retroactive pay pot in contrast to line pilots' 38 percent shares.

### C. APLA's Intent in Adopting the LOA 24 Formula

#### 1. ALPA's Treatment of Pilot Instructors

Arellano, the pilot instructor member of Subcommittee 2, told John Barton, a line pilot and MEC member, that "during Subcommittee 2 meetings[,] comments were made" by Steve Lynch, a line pilot member of the subcommittee, "to the effect that pilot instructors should get less in retro pay because they were 'not real pilots' and made a lot of money for 'working at home.'" Doc. 353-1 at 99, ¶ 4.[*] In other instances, Arellano expressed the view that ALPA treated pilot instructors fairly and took their concerns seriously. On an April 14, 2013 phone call, Arellano reassured fellow pilot instructor Ralph Casciano regarding ALPA's motivations. Arellano's first sentence after they greeted each other was, "[l]ook, they [Subcommittee 2] weren't trying to treat you [pilot instructors] disparately," *id*. at 25 (2:24-25), adding later that pilot instructors "were never stifled" and had "been given great latitude," *id*. at 33 (10:1-2). As an example, Arellano noted that the MEC had granted him special privileges to bring additional pilot instructor representatives to MEC meetings: "[The MEC chair] could have told me to go pound sand, but he let me bring somebody when the other councils couldn't take reps." *Id*. at 32

---

[*] Plaintiffs present this evidence through Barton's declaration. Doc. 353-1 at 99, ¶ 4. Later in his declaration, Barton avers that Arellano told him that "the other members of Subcommittee 2 were all trying to cut [pilot instructors] out of retro pay because [pilot instructors] … were going to make a lot of money under the [2012 UPA]." *Id*. at 99, ¶ 5. ALPA objects to that portion of the declaration on the ground that Barton does not explain how Arellano had personal knowledge—for example, from what other subcommittee members had told him—that those other subcommittee members sought to limit pilot instructors' retroactive pay because of their substantial wage gains under the 2012 UPA. Doc. 357 at 13 n.13. Although Plaintiffs had the opportunity in a surreply to respond to ALPA's objection, they failed to do so, Doc. 366 at 3-4, thereby forfeiting the point. Even putting aside forfeiture, ALPA is correct on the merits of its objection. *See* Fed. R. Evid. 602 ("A witness may testify to a matter only if evidence is introduced sufficient to support a finding that the witness has personal knowledge of the matter."); *Widmar v. Sun Chem. Corp.*, 772 F.3d 457, 460 (7th Cir. 2014) ("Personal knowledge can include reasonable inferences, but it does not include speculating as to an [opposing party's] state of mind, or other intuitions, hunches, or rumors.").

(9:12-14). Arellano also observed that, when there were "competing grievances" from different pilot groups, pilot instructors "were given the money to take the grievances to system board." Doc. 350-2 at 10 (9:13-17); *see also* Doc. 353-1 at 33 (10:5-9). (Because transcripts of the April 14, 2013 phone call are in the record, there is no need to consider the averments Casciano makes in his declaration about the call. Doc. 354-1 at 106-109. In any event, Plaintiffs did not respond in their surreply to ALPA's objection to those portions of Casciano's declaration, Doc. 358 at ¶ 24; Doc. 357 at 15 & n.16, thereby forfeiting the point.)

Arellano offered similar thoughts at his deposition about the generally fair treatment pilot instructors received from ALPA: "They never shut down anything I tried to do. As a matter of fact, they were always willing to listen to me … ." Doc. 359-1 at 4 (13:7-9). Arellano added that Subcommittee 2 did not "rebuff my concerns" and that "[t]hey did listen." *Id*. at 9 (48:19), 15 (157:21). As to ALPA's leadership, Arellano testified that "the MEC has been supportive of [the pilot instructors]." *Id*. at 10 (51:11-12). And reiterating a point he made in his call with Casciano, Arellano pointed out that the MEC gave pilot instructors resources to arbitrate grievances in front of the "system boards." *Ibid*. (51:12-52:1).

Finally, Arellano has repeatedly observed that ALPA negotiated a highly favorable overall deal for pilot instructors in 2012. Arellano told Casciano on their call that the MEC "let [pilot instructors] negotiate their own contract." Doc. 353-1 at 32 (9:22-23). Arellano added that he personally "took home a net increase of 73 percent" from the 2012 UPA, observed that pilot instructors "made out like fucking banshees," *id*. at 61 (38:13-19), and described the pilot instructors complaining about the 2012 UPA as "emotional children," *id*. at 65 (42:5). And at his deposition, Arellano testified that pilot instructors "got a grand slam" and won "a huge victory" in the 2012 UPA. Doc. 359-1 at 6 (19:22-23, 20:6).

16

### 2. Adoption of the LOA 24 Formula

During Subcommittee 2's retroactive pay discussions, Arellano at first advocated for an allocation formula that would have awarded pilot instructors a larger collective slice of the $225 million pie. Specifically, given the highly favorable changes made to the pilot instructor pay cap in the 2012 UPA, Arellano "attempted to use the 2012 UPA agreement, which had the new pay rates and had a change in some contractual language," to calculate the minuend of the pilot instructors' Delta Differentials. *Id*. at 3 (6:4-6); *see also ibid*. (7:13-15) (Arellano testifying that he was "advocating for language that would … incorporate the [pilot instructor] pay cap change" from the 2012 UPA); *id*. at 15 (156:24-25) (Arellano testifying that he "viewed retro as using 2012 contract language and 2012 pay rates with that new pay cap"). In so doing, Arellano tried to "stop" Subcommittee 2 from "using the 2003 [UPA's] pay cap" in the formula, "explain[ing] to members of Subcommittee 2 that using the 2003 pay cap would not accurately represent the pilot instructors' retro pay." *Id*. at 16-17 (161:19-24, 169:1-4).

Subcommittee 2 nevertheless proposed using the 2003 UPA's pay cap to calculate the minuend of the pilot instructors' Delta Differentials and their number of credited Retro Pay Hours. The reason it did so is the central factual question in this case.

As noted, Arellano told Barton that other Subcommittee 2 members pressed for an allocation formula unfavorable to pilot instructors on the ground that pilot instructors are "not real pilots." Doc. 353-1 at 99, ¶ 4. At other points, however, Arellano stated that Subcommittee 2 proposed what became the LOA 24 formula because it was a simple rule that could be applied in the same manner to all pilots. In his call with Casciano, Arellano emphasized that preserving every 2003 UPA contract term except for hourly wage rates—which, as noted, were taken from

17

the 2010 Delta CBA—was a simple and formally neutral manner of crafting the formula, though

that simplicity and neutrality ended up negatively affecting pilot instructors:

- "[W]e want something as simple as possible … . [T]hey did that with how they treated the [pilot instructors]. It's simple … . The contract is a contract. All they would change was the hourly rate." *Id*. at 26 (3:16-22).

- "Everybody else got retro except for the [pilot instructors] because in their effort to be simplistic and not open up a can of worms where somebody could say one group was treated differently … there was harm done … ." *Id*. at 27 (4:1-11).

- "[Subcommittee 2's] charter, in essence, was devise a way in which the distribution is simple, stupid and doesn't create disparate treatment by making funky rules." *Id*. at 39 (16:17-20).

- "It was done in the simplistic form, and I agree it was simplistic. They just treated this incorrectly." *Id*. at 62 (39:10-11).

Arellano's deposition testimony likewise emphasized ALPA's desire for a simple formula that

treated all pilots in a formally neutral manner, without regard to the formula's result:

- "[W]e were trying to find something simplistic that had established metrics or quantifiable ties to current contracts so that [members] could … understand how they came up with that." Doc. 359-1 at 3 (7:3-7).

- "[Tom Brinton and I] came to the conclusion that in order to make it simplistic … Tom and I supported the methodology that ultimately became LOA 24." *Id*. at 7 (34:19-24).

- "So the LOA 24 was fair, it was equitable, it was apples to apples." *Id*. at 8 (45:21-22).

- "That was the whole point of simplistic and fair and equitable without disparate treatment. … It didn't matter the result." *Id*. at 4 (12:4-7).

- "The result was not something we were looking at … ." *Id*. at 5 (16:12-13).

Arellano has thus consistently maintained that using the 2003 UPA's non-hourly wage rate

provisions—including the pilot instructors' pay cap—in the allocation formula served the goal of

formal neutrality, though he had hoped to win a better deal for pilot instructors.

The text and mechanics of the LOA 24 formula corroborate Arellano's assessment of its formal neutrality. As described above, two variables determined a pilot's retroactive pay award under the formula: (1) the number of credited Retro Pay Hours; and (2) the Delta Differentials for each of those hours. Doc. 354-2 at 7, § B.10. To calculate the number of hours for line pilots, the formula incorporated without modification the 2003 UPA's time credit provisions. *Id.* at 7, § C.1.a-.e. The formula did the same for pilot instructors, leaving unchanged the 89-hour component of the pay cap from the 2003 UPA. *Id.* at 7, § C.2. To calculate hourly Delta Differentials, the formula again relied on 2003 UPA's non-hourly rate terms across the board. For a line pilot, each Retro Pay Hour was categorized according to the fleet, seat, and longevity that the pilot had held "for the [Retro Pay] Hour involved." *Id.* at 6, § B.9. The rule for pilot instructors also looked to the fleet-seat-longevity combination they held under the 2003 UPA, *i.e.*, "767/757 First Officer with 6 yr longevity." *Id.* at 7, § C.2. On both key variables, the formula carried over the 2003 UPA's non-hourly rate terms for line pilots *and* pilot instructors. Arellano therefore was correct when he told Casciano: "The [2003] contract is a contract. All they would change was the hourly rate." Doc. 353-1 at 26 (3:21-22); *see also* Doc. 359-1 at 4 (11:10-15) (Arellano testifying that "the 2003 [UPA was] also used as the base for the calculation of the retro pay for the line pilots").

This formally neutral rule had drawbacks for line pilots, too. As explained above, the 2012 UPA increased the monthly hours guarantees for ordinary line pilots and reserve line pilots, from 65 to 70 and from 70 to 73, respectively, Doc. 149-3 at 43, § 3-B-7-a; *id.* at 79, § 3-C-1, and yet those increases were not incorporated into the allocation formula. Arellano highlighted this issue for Casciano, observing that other members of Subcommittee 2 had expressed concern that "if we changed [the instructors' cap]," then reserve pilots would argue "you need to change

my reserve hours from 70 to 73 guaranteed." Doc. 353-1 at 28 (5:10-11). Arellano's point was that, if the LOA 24 formula did not incorporate the 2003 UPA's pay cap for pilot instructors, other groups of pilots would have had sound arguments that *their* Retro Pay Hours should *also* account for changes won in the 2012 UPA. As another example, line pilots won more vacation time in the 2012 UPA, yet that component of their revised pay scheme was not incorporated into the LOA 24 formula. Doc. 354-2 at 7, § C.1.d (formula maintaining 2003 UPA's vacation provision); Doc. 349-1 at 8 (50:7-10) (testimony that line pilots won additional vacation hours under the 2012 UPA).

Arellano explained that these considerations convinced him to give up his effort to incorporate the 2012 UPA's pay cap into the retroactive pay allocation formula. He concluded that "there was no way" to incorporate *some* non-hourly wage rate provisions from the 2012 UPA into the formula without "hav[ing] [pilot instructors] treated one way with some contractual inclusions and the line [pilots] hav[ing] a different set of [in]clusions or different metrics." Doc. 359-1 at 3 (8:3-7). According to Arellano, picking and choosing among contractual provisions in that manner could have provoked charges of "disparate treatment." *Ibid.* (8:10). Arellano emphasized that "[t]he important part was no disparate treatment, apples to apples," adding: "The instructors, to keep us from having disparate treatment, we needed to follow the same methodology that the line pilots were using. … We weren't going to cherry pick provisions for each group." *Id.* at 4 (10:5-6, 11:16-12:6). As Arellano summed up: "I couldn't get to use the 2012 [pay cap] without creating disparate groups. I'd have to make an exception for the [pilot instructors], and that was the problem." *Id.* at 17 (167:22-24).

For that reason, and despite his reservations, Arellano ultimately supported Subcommittee 2's proposal. Arellano acknowledged that "the decision to propose LOA 24 as

the methodology [was] a consensus position of the subcommittee," that he was "part of that consensus," and that he "agree[d] with that consensus." *Id*. at 20 (223:15-23). When the MEC considered whether to approve the formula, Arellano spoke in favor of and voted for it because he believed "it would stand the test of time and not have lawsuits." *Id*. at 5 (17:4-20). Finally, when the entire package—the 2012 UPA and the LOA 24 retroactive pay allocation formula— went to the membership for ratification, Arellano voted for it because "[i]t was a great and fantastic agreement for the [pilot] instructors." *Id*. at 6 (19:1-8).

Plaintiffs dispute how happy Arellano *really* was with the formula, pointing to statements he later made disparaging its use of the 2003 UPA's pay cap. Doc. 353 at ¶ 46. Those statements are detailed below. But on the question whether Arellano consistently cast his vote for the formula, Plaintiffs adduce no evidence undermining that historical fact.

### 3. Dueling Accounts at the Arbitration Regarding Arellano's Views

In presenting its position during the April 2013 arbitration, ALPA pointed to Arellano's support for the allocation formula as among the reasons why the arbitrator should uphold it. ALPA's pre-hearing statement, submitted on April 15, 2013, asserted that "a [pilot instructor] status representative"—Arellano—"was on the MEC Subcommittee that determined the MEC [retroactive pay] methodology and favored the method provision on treatment of [pilot instructors]; further, this same individual was on the MEC and voted in favor of the methodology." Doc. 358 at ¶ 22; Doc. 354-2 at 61, 63. Nobody at ALPA contacted Arellano about its pre-hearing statement or asked him to confirm his support for the formula. Doc. 358 at ¶ 34; Doc. 354-1 at 100 (200:10-22).

Upon learning of ALPA's pre-hearing statement, Arellano sent identical emails to two pilot instructors, Casciano and Dave Banker, shortly after midnight on April 16. Doc. 358 at

¶ 34; Doc. 350-1 at 4; Doc. 354-1 at 111. Taking issue with certain "statements attributed to me" by ALPA, Arellano explained that "nobody in ALPA called me" about its pre-hearing statement and that "[h]ad they called, they would not have written those comments attributed to me!" Doc. 350-1 at 4. Arellano stated that he "did not agree with the methodology as it pertained to [pilot instructors] and … stated so on numerous occasions to [Subcommittee 2 chair] Bob Fox." *Ibid*. Arellano added that the formula "did not accurately represent the [pilot instructors'] receiving actual retro-active pay" due to its incorporation of the 2003 UPA's pay cap, and dismissed as irrelevant—"NUTS"—the fact that he had voted to approve it. *Ibid*. All MEC members, he explained, voted for "a multitude of line items" with which they had "complete disagreement" because they did not have "line item veto authority." *Ibid*. If he had possessed that authority, Arellano added, he would have "struck and re-written" the formula. *Ibid*. He explained, however, that by the end of negotiations, he and fellow pilot instructor Brinton were "resigned" to the formula. *Ibid*.

Arellano made similar comments on his April 14 call with Casciano. Arellano explained that he had merely acquiesced to, not affirmatively endorsed, the formula: "I tried … to make sure what happened did not happen, but I didn't prevail." Doc. 353-1 at 26 (3:10-12). Arellano told Casciano that he had brought Brinton to Subcommittee 2 meetings because he was "getting shut out" on his own. *Id*. at 31 (8:3). Finally, he explained that he had supported the entire 2012 package as a "totality," not based on "a single issue, like retro." *Id*. at 58 (35:1-2). According to Arellano, it therefore was an "idiotic argument" to point to his votes as conclusive evidence of his personal support for the formula. *Id*. at 59 (36:5-7). But, in the end, Arellano stated that he "had to accept the wart. The wart was how we got treated." *Ibid*. (36:24-25). As he put it, that was "just politics," and "[y]ou can't let politics bother you." *Id*. at 60 (37:8-9).

At the arbitration, Fox reinforced what ALPA's pre-hearing statement had asserted about Arellano's involvement with and support for the LOA 24 formula. Doc. 358 at ¶ 21. Fox testified that Arellano "was an intimate member of the committee" and that "we relied heavily on [his] advice." Doc. 354-1 at 149 (59:10-13). Asked whether incorporating the 2003 UPA's pay cap into the formula was a "proposal from … Arellano," Fox responded "[y]es." *Ibid*. (60:2-4). And Fox emphasized that Arellano was an "integral part of the committee" and that his "recommendation was this is the way to go." *Id*. at 150 (61:18-21).

Arellano addressed Fox's arbitration testimony at his September 2019 deposition. When asked whether, "[i]f Mr. Fox stated that you actually proposed the LOA 24 methodology, would that be an accurate statement," Arellano replied in the affirmative. Doc. 359-1 at 6 (18:11-14). But Arellano also testified that it was "not my idea" to use the 2010 Delta CBA's hourly wage rates and that he did not "come up with [the idea of incorporating] the 2003 [UPA's pay] cap [into the formula]." *Id*. at 16 (158:23-159:8). At his own deposition, Fox recharacterized his arbitration testimony regarding Arellano's views: "I looked at the word 'proposed' as, at the end of the day, [Arellano] agreed to use … the cap that they were working under … ." Doc. 359-4 at 16 (117:14-17). Fox added that this is "why I stated that [Arellano] … was in favor of using the method." *Id*. at 21 (146:1-6). Brinton, by contrast, testified that Arellano "probably didn't" propose the formula because he "didn't feel like it was correct." Doc. 349-1 at 5 (39:7). Viewing these arguably inconsistent recollections through the lens required at this stage, the court concludes for purposes of summary judgment that Fox inaccurately testified at the arbitration hearing that Arellano had proposed the LOA 24 formula.

At his deposition, Arellano also addressed his comments in his April 16 emails to Casciano and Banker and during his April 14 call with Casciano. Arellano testified that his

"NUTS" comment was meant to express that "if I could have had my cake and eat it, too … I would have changed the retro pay allocation." Doc. 359-1 at 7 (36:19-22). But he explained that "[t]he fact was it wasn't justifiable … to treat people differently"—that is, to displace the 2003 UPA's non-hourly rate terms for pilot instructors but not for other pilots—because all pilots were "sharing a bucket of money." *Ibid.* (37:3-5). Arellano testified that he would have "preferred … [ALPA's] pre-hearing statement" to have said that he "ultimately agreed to the methodology" despite originally favoring "alternatives to what became LOA 24." *Id.* at 20 (224:9-21). When asked about his call with Casciano, Arellano testified that he was merely expressing "disappointment" with the LOA 24 formula. *Id.* at 18 (173:9). In summary, Arellano testified: "[Brinton] and I were resigned to a methodology that we supported. We voted, we adopted, it was because there was no better way of doing it without making it controversial and disparate treatment." *Id.* at 21 (239:4-7).

### D. Possibility of Retaliation Against Pilot Instructors

Arellano made certain statements to Casciano warning of "repercussions" from the MEC should pilot instructors file a lawsuit about the LOA 24 formula. Doc. 354 at ¶¶ 35-36. Specifically, Arellano told Casciano on their call that, if he and other pilot instructors sued ALPA, "the MEC will come back after you" and "you will not be able to stop it because it will be one vote versus the rest of the table." Doc. 353-1 at 62-63 (39:20-40:8). Although Plaintiffs cite Arellano's remarks in their Local Rule 56.1(b)(3)(C) statement and the background section of their summary judgment opposition brief, they do not rely on those remarks in the argument section of their brief. Doc. 355 at 17-32. Plaintiffs thus have forfeited any argument that those remarks by Arellano are material to the legal issues presented in ALPA's summary judgment motion. *See M.G. Skinner & Assocs. Ins. Agency, Inc. v. Norman-Spencer Agency, Inc.*, 845

F.3d 313, 321 (7th Cir. 2017) ("Perfunctory and undeveloped arguments are waived, as are arguments unsupported by legal authority.").

In any event, over seven years have passed since this lawsuit was filed, and Plaintiffs adduce no evidence that ALPA has done anything to retaliate against them or pilot instructors as a whole during that time. In fact, the 2012 UPA has since been renegotiated, and according to Brinton, pilot instructors are now making "much, much more money" than they ever have. Doc. 349-1 at 9 (65:9). Plaintiffs argue that Arellano's and Brinton's unkind statements about Casciano at their 2019 depositions evince ALPA's "campaign of character assassination against Casciano." Doc. 355 at 17 n.7. But Arellano, Brinton, and Casciano are all pilot instructors, and Arellano has not served as a member of the MEC since February 2013. Doc. 359-1 at 10 (53:12-14); Doc. 359-2 at 6. Their personal differences in 2019 therefore do not show animus on the part of *ALPA* against pilot instructors.

## Discussion

"A union breaches the duty of fair representation if its actions are (1) arbitrary, (2) discriminatory, *or* (3) made in bad faith." 900 F.3d at 397 (emphasis added) (citing *Air Line Pilots Ass'n, Int'l v. O'Neill*, 499 U.S. 65, 67 (1991)). In reversing this court's Rule 12(c) dismissal of the pilot instructors' claim, the Seventh Circuit held that although Plaintiffs had not plausibly alleged that APLA acted arbitrarily, they had "plausibly pleaded allegations of bad faith and discrimination." *Id*. at 400; *see also id*. at 401 (Hamilton, J., concurring in the judgment) (observing that all panel members "agree[d] that plaintiffs have not alleged a viable claim for 'arbitrary' action by the union"). Accordingly, Plaintiffs' claim on remand is limited to whether ALPA's adoption of the LOA 24 formula was discriminatory or made in bad faith. *See Carmody v. Bd. of Trs. of Univ. of Ill.*, 893 F.3d 397, 407 (7th Cir. 2018) ("The law of the case

doctrine is a corollary to the mandate rule and prohibits a lower court from reconsidering on remand an issue expressly or impliedly decided by a higher court … .") (internal quotation marks omitted).

The Seventh Circuit's opinion articulates general principles pertinent to that claim. "When [a court] ask[s] whether 'a union's actions are discriminatory or in bad faith,' there must be 'proof that the union acted (or failed to act) due to an improper motive.' Such an inquiry calls for a subjective inquiry into the union's motives." 900 F.3d at 398 (quoting *Neal v. Newspaper Holdings, Inc.*, 349 F.3d 363, 369 (7th Cir. 2003)). "The case law recognizes that unions often must make decisions that distinguish among different categories of employees. In that situation, unions must represent 'all the employees as a unit acting by majority vote,' even though 'each individual employee in the unit is a beneficiary of this collective action.' This tension inherent in this obligation requires [a court] to recognize when assisting claims of discrimination or bad faith that 'the interests of individual employees sometimes may be compromised for the sake of the larger bargaining collective.'" *Ibid.* (quoting *Garcia v. Zenith Elecs. Corp.*, 58 F.3d 1171, 1175, 1176 (7th Cir. 1995)). "[A court's] obligation to recognize the tension caused by the union's concurrent obligations to its collective membership and to the individual members means that a claims of discrimination or bad faith must rest on more than a showing that a union's actions treat different groups of employees differently. A union member's claim must be based on more than the discriminatory *impact* of the union's otherwise rational decision to compromise." *Ibid.* (citing *O'Neill*, 499 U.S. at 81).

As to what showing is required—at least where there is no allegation of animus based on race, nationality, sex, sexual orientation, or some other protected characteristic—the Seventh Circuit held that a union's actions are discriminatory or in bad faith when it acts "'*solely* for the

benefit of a stronger, more politically favored group over a minority group,'" *id*. at 399

(emphasis in original) (quoting *Barton Brands, Ltd. v. NLRB*, 529 F.2d 793, 798-99 (7th Cir.

1976)), meaning that a union may not "make[] decisions 'for *no apparent reason* other than

political expediency,'" *ibid*. (emphasis added) (quoting *Barton Brands*, 529 F.3d at 800).  In

holding that a union acts in a discriminatory or bad faith manner only when its *sole* motive is to

benefit one group of members over another, the Seventh Circuit adhered to the long-settled

standard articulated in several decisions it cited.  *See Barton Brands*, 529 F.2d at 800 (holding

that the union would be "absolved of liability" if it could "show *some* objective justification for

its conduct *beyond* that of placating the desires of the majority of the unit employees at the

expense of the minority") (emphases added); *Addington v. US Airline Pilots Ass'n*, 791 F.3d 967,

985 (9th Cir. 2015) ("Decisions benefitting a majority of the group may not be made *merely*

because the losers ha[d] too few votes to affect the outcome of an intra-union election.")

(emphasis added) (internal quotation marks omitted); *Ramey v. Dist. 141, Int'l Ass'n of*

*Machinists & Aerospace Workers*, 378 F.3d 269, 277 (2d Cir. 2004) ("[A] union may not juggle

the seniority roster *for no reason other* than to advance one group of employees over another or

to punish a disfavored group.") (emphasis added) (internal quotation marks omitted); *Teamsters*

*Local Union No. 42 v. NLRB*, 825 F.2d 608, 611 (1st Cir. 1987) ("[A] union may not, *without a*

*legitimate purpose*, take action favoring some of its members at the expense of others.  In

particular, a union may not neglect the interests of a membership minority *solely* to advantage

the membership majority.") (emphases added) (citing *Barton Brands*, 529 F.2d at 799-800).

Plaintiffs could not and, in fact, do not argue for a different standard.  The "sole motive"

standard is the one articulated in the operative complaint, Doc. 29 at ¶ 78 (alleging that a union

breaches its duty of fair representation "by acting for the sole purpose of benefitting a stronger,

more politically favored group over a minority segment of the union"), and in their Rule 12(c) opposition brief, Doc. 149 at 22 ("While a union may make decisions 'within a wide range of reasonableness … , such decisions may not be made solely for the benefit of a stronger, more politically favored group over a minority group.'") (alteration in original) (quoting *Barton Brands*, 529 F.2d at 798-99).  And the "sole motive" standard is the one that ALPA articulates in seeking summary judgment, Doc. 347 at 22-23, without any hint of a suggestion from Plaintiffs that a different standard should apply, Doc. 355 at 20.  By pressing the "sole motive" standard and not opposing ALPA's articulation of that standard, Plaintiffs both waived and forfeited any argument that a different standard governs.  *See Cossel v. Miller*, 229 F.3d 649, 653 (7th Cir. 2000) ("A litigant that fails to present an argument to the district court cannot rely on that argument in the court of appeals, and this rule certainly encompasses a litigant that adopts a position on appeal that is contrary to its position in the district court."); *Salas v. Wis. Dep't of Corr.*, 493 F.3d 913, 924 (7th Cir. 2007) ("[A] party forfeits any argument it fails to raise in a brief opposing summary judgment.").

ALPA is entitled to summary judgment under the sole motive standard.  True enough, the summary judgment record, viewed in the light most favorable to Plaintiffs, could be read to support the proposition that ALPA's adoption of the LOA 24 formula was motivated *in part* by animus toward the pilot instructor minority.  The LOA 24 formula netted pilot instructors $6.25 million less than what they would have received under the formula they now say should have been adopted.  Doc. 354-2 at 33, ¶ 5.  Arellano told a colleague that Lynch, a line pilot member of Subcommittee 2, said that "pilot instructors should get less in retro pay because they were 'not real pilots' and made a lot of money for 'working at home.'"  Doc. 353-1 at 99, ¶ 4. And in its pre-hearing statement and at the April 2013 arbitration hearing itself, ALPA at least

exaggerated, and arguably misrepresented, the degree of Arellano's responsibility and support for the formula. Doc. 354-2 at 63; Doc. 354-1 at 149 (60:2-4); *see* 900 F.3d at 400 (holding that such misrepresentations "can be evidence of bad faith") (internal quotation marks omitted).

At the same time, the record indisputably shows that APLA also had a nondiscriminatory, good faith justification for adopting the LOA 24 formula: the desire for a simple, facially neutral rule that would be understood as equitable by ALPA's entire membership. Arellano was consistent on this score, which is highly significant given Plaintiffs' substantial reliance on his unhappiness with the formula to show that ALPA violated its fair-representation duty to pilot instructors. Doc. 355 at 25 (citing Arellano's statement to Casciano that the formula "doesn't work" for pilot instructors); *id*. at 26 (citing Arellano's statement that "everybody else got retro except for the [pilot instructors]"); *id*. at 27 (arguing that Arellano's statements "forcefully undermine[] ALPA's initial justification for adopting the allocation methodology").

Arellano repeatedly conveyed his understanding and acceptance of ALPA's proper motive. He told Casciano that "they [Subcommittee 2] weren't trying to treat you [pilot instructors] disparately," and that the reason Subcommittee 2 kept all of the 2003 UPA's non-hourly rate terms in the formula was that it "want[ed] something as simple as possible" that "doesn't create disparate treatment by making funky rules." Doc. 353-1 at 25 (2:24-25), 26 (3:16-17), 39 (16:18-20). He further explained: "[I]n [the] effort to be simplistic and not open up a can of worms where somebody could say one group was treated differently than the others … in my opinion, there was harm done … . [Y]ou've harmed the [instructors] because … our hourly rates were impacted by an artificial cap." *Id*. at 27 (4:1-24). Yet, Arellano acknowledged: "[ALPA's] argument was, in the simplistic fashion, if we changed [the cap], then

other groups … will say … you need to change my reserve hours from 70 to 73 guaranteed. … I understand their argument.  And their argument is not incorrect." *Id*. at 28 (5:7-15).

At his deposition six years later, Arellano offered the same view, testifying that Subcommittee 2 sought "something simplistic" that would give everyone "apples to apples" treatment.  Doc. 359-1 at 3 (7:4, 9:12), 4 (10:6, 11:15-18), 8 (45:21-23), 9 (48:2-5); Doc. 353-1 at 18 (165:17-22).  Moreover, Arellano testified that maintaining the 2003 UPA's non-hourly wage rate provisions in the formula disadvantaged line pilots in certain respects as well, by not allowing them to benefit from the increases in minimum hours they achieved in the 2012 UPA. Doc. 359-1 at 11 (73:1-23); Doc. 149-3 at 79-80, § 3-C-1.  As a result, Arellano explained, using the 2012 UPA's non-hourly rate pay provisions for pilot instructors—while not doing the same for provisions favorable to line pilots—would have exposed ALPA to claims of mistreatment from *line pilots*: "We weren't going to cherry pick provisions for each group."  Doc. 359-1 at 4 (12:5-6).  The benefits of simplicity and formal neutrality were why Arellano ultimately voted for the formula despite his misgivings: "I couldn't … use the 2012 [UPA in LOA 24] without creating disparate groups.  I'd have to make an exception for the [pilot instructors], and that was the problem." *Id*. at 17 (167:22-24).

Arellano's statement in his April 16, 2013 emails that he remained in "complete disagreement" with the LOA 24 formula, Doc. 350-1 at 4, does not undermine his recognition of ALPA's permissible motive.  Nor do his comments to Casciano that he "had to accept the wart" and that his acceptance of the formula was "just politics."  Doc. 353-1 at 59 (36:24-25), 60 (37:8).  Arellano testified that, as in any negotiation, he did not get everything he wanted. Doc. 359-1 at 7 (36:19-37:9), 18 (170:13-171:1).  Moreover, he recognized as valid ALPA's desire for simplicity and formal neutrality: "[I]f I could just forget the disparate treatment … I

would change that, the retro.  The fact was it wasn't justifiable … to treat people differently … so that's why I supported the LOA 24." *Id*. at 7 (36:23-37:6).  As he summarized near the end of his deposition: "I advocated for a position.  It wasn't defensible. … I couldn't make that a methodology that worked.  We ended up with a methodology that we could defend."  *Id*. at 21 (238:22-239:2).

In an effort to create a disputed issue of fact concerning ALPA's permissible motive for adopting the LOA 24 formula, Plaintiffs argue that because ALPA exaggerated or misrepresented at the April 2013 arbitration Arellano's depth of support for the formula, Arellano *himself* must be lying that ALPA had neutral motives.  Doc. 355 at 21-22, 26-27.  No reasonable juror could draw that illogical inference.  Even if ALPA made misrepresentations about Arellano, how would that cast doubt on *Arellano's* credibility?  Far from collaborating with ALPA's deceit, Arellano immediately emailed pilot instructors upon learning of ALPA's representations.  Doc. 358 at ¶ 34; Doc. 350-1 at 4; Doc. 354-1 at 111.  Indeed, Arellano is Plaintiffs' principal witness for the proposition that ALPA engaged in those misrepresentations.  Given this, Plaintiffs cannot reasonably use ALPA's misrepresentations about Arellano to undermine the credibility of *his own* assessments as to the permissible motives underlying ALPA's adoption of the formula.

Plaintiffs also argue that the formula was drafted in a way that subjected pilot instructors to a "special rule."  Doc. 355 at 11-12.  In detailing the mechanics of the allocation formula, LOA 24 first sets forth a "General Rule" to translate Individual Pilot Delta Differentials into dollar amounts.  Doc. 354-2 at 6, § A.  Other provisions defined the Delta Differentials.  *Id*. at 6-7, § B.9-.10.  Another provision stated that the pilot instructors' Delta Differentials would rest in part on the 2003 UPA's pay cap.  *Id*. at 7, § C.2.  Plaintiffs call that provision a "special rule"—a

31

term that does not appear in LOA 24—and argue that it proves the formula was not formally neutral. Doc. 355 at 12.

The argument is wholly without merit. As explained above, the use of the 2003 UPA's pay cap for pilot instructors paralleled other provisions in the formula maintaining the 2003 UPA's non-hourly rate terms for all pilots. LOA 24 had provisions that used the 2003 UPA to calculate Retro Pay Hours for line pilots, through incorporating the 2003 UPA's Protected Time Credit, reserve guarantee, and vacation provisions. Doc. 354-2 at 7, § C.1.a-.d. LOA 24 also had provisions explaining precisely how the 2003 UPA's terms would carry over for other pilots. *Id*. at 8-9, §§ C.5, .8, .12-.14. Pilots on Special Assignment were credited with Retro Pay Hours equal to "credit hours earned," without change from the 2003 UPA. *Id*. at 8, § C.5. Retired pilots received Retro Pay Hours only for the hours they had actually worked, consistent with the 2003 UPA. *Ibid*., § C.8. Short-term disabled and injured pilots were credited with hours in accordance with the relevant portions of the 2003 UPA, which LOA 24 expressly incorporated by reference. *Id*. at 9, §§ C.12, .14. Nearly every type of pilot was mentioned in LOA 24. The fact that LOA 24 used additional provisions to explain how the formally neutral allocation formula applied to various pilot groups does not undermine its formal neutrality.

Ultimately, the summary judgment record discloses no genuine dispute as to a permissible motive for ALPA's adoption of the LOA 24 formula: a desire for simplicity and formal neutrality. Pursuing these goals, ALPA chose to incorporate the higher hourly wage rates from the 2010 Delta CBA but to leave all other 2003 UPA terms unchanged. The formula was drafted to do just that. Simplicity and formal neutrality—whatever their impact on various groups within a union—are legitimate, nondiscriminatory, good faith goals for a union to pursue. *See O'Neill*, 499 U.S. at 81 ("[S]ome form of allocation was inevitable. A rational compromise

32

… was not invidious 'discrimination' of the kind prohibited by the duty of fair representation."); 900 F.3d at 398 ("A union member's claim must be based on more than the discriminatory *impact* of the union's otherwise rational decision to compromise."); *Rakestraw v. United Airlines, Inc.*, 981 F.2d 1524, 1533 (7th Cir. 1992) ("Equal treatment does not become forbidden because the majority prefers equality, even if formal equality bears more harshly on the minority.").

Because ALPA indisputably had a legitimate motive for adopting the LOA 24 formula, it cannot be held liable for discrimination or bad faith on a theory of intra-union political bias. Again, as the Seventh Circuit held, a union engages in discriminatory or bad faith conduct only when it acts "*solely* for the benefit of a stronger, more politically favored group over a minority group." 900 F.3d at 399 (emphasis in original) (internal quotation marks omitted). Consistent with this principle, the Seventh Circuit has upheld summary judgment for union defendants where the record disclosed a legitimate purpose, despite some evidence suggestive of a concurrent illicit motive. *See Konen v. Int'l Bhd. of Teamsters*, 255 F.3d 402, 408 (7th Cir. 2001) (affirming summary judgment on a bad faith claim even though union officials "indicated that they were angry at [the plaintiff]," reasoning that the union had also legitimately concluded that the plaintiff's grievance was "baseless"); *Griffin v. Air Line Pilots Ass'n, Int'l*, 32 F.3d 1079, 1084 (7th Cir. 1994) (affirming summary judgment despite the plaintiffs' adducing "statements by highly-placed union officials expressing distaste for pilots who did not join the union"). The same result is appropriate here.

Granting summary judgment to ALPA is not inconsistent with the Seventh Circuit's opinion in this case. In holding that Plaintiffs' claim could not be dismissed on the pleadings, the Seventh Circuit highlighted the complaint's allegations "that pilot instructors make up a

minority of ALPA's membership and that ALPA acted with the intent to appease its majority membership, the line pilots, after a lengthy and contentious CBA negotiation." 900 F.3d at 399. Drawing reasonable inferences in Plaintiffs' favor, the complaint alleged that this was the sole reason ALPA adopted the LOA 24 formula. Doc. 29 at ¶ 21 ("ALPA designed an allocation formula that included numerous arbitrary exceptions and special rules designed to ensure that [the pilot instructor minority] would receive, at most, a fraction of their deserved retro pay … ."); *id*. at ¶ 79 (alleging that ALPA "discriminat[ed] against, express[ed] hostility and act[ed] with animosity towards [pilot instructors by] … disregard[ing] their interests in favor of the stronger, more politically favored majority … in its misallocation of the retro pay").

The summary judgment record, however, shows that ALPA had—either instead of or in addition to a discriminatory motive—a neutral, permissible motive for adopting the formula. That defeats Plaintiffs' duty of fair representation claim under the governing standard. 900 F.3d at 401 (Hamilton, J., concurring in the judgment) (observing that "dismissal on summary judgment or at trial seems likely once we focus on just how small a target plaintiffs must hit to prove a breach of the duty of fair representation"); *id*. at 404 ("The cited decisions from other circuits similarly required plaintiffs to show that a union acted solely for an improper purpose. I trust the district judge will apply this high standard at summary judgment or trial."); *id*. at 405 ("Though plaintiffs have barely cleared the pleading standard here, they will have a difficult time proving what the need to prove on the merits.").

**Conclusion**

ALPA's summary judgment motion is granted. Judgment will be entered in favor of ALPA and against Plaintiffs.

January 5, 2021

_____
United States District Judge