In the

# United States Court of Appeals

## For the Seventh Circuit

―――――――――――

No. 21-1034

DAVID BISHOP and ERIC LISH,

*Plaintiffs-Appellants*,

*v.*

AIR LINE PILOTS ASSOCIATION
INTERNATIONAL,

*Defendant-Appellee*.

―――――――――――

Appeal from the United States District Court for the
Northern District of Illinois, Eastern Division.
No. 1:13-cv-06243 — **Gary Feinerman**, *Judge*.

―――――――――――

ARGUED MAY 21, 2021 — DECIDED JULY 15, 2021

―――――――――――

Before SYKES, *Chief Judge*, and RIPPLE and HAMILTON, *Circuit Judges*.

RIPPLE, *Circuit Judge*. The plaintiffs, pilot instructors for United Airlines, brought this class action against the Air Line Pilots Association, International ("ALPA"), their recognized agent for the purpose of collective bargaining. In their complaint, they alleged that ALPA had violated its duty of fair representation under the Railway Labor Act, 45 U.S.C.

§ 151 *et seq.*, by adopting a retroactive pay provision that discriminated against pilot instructors. The district court initially dismissed the complaint; however, on appeal, we reversed the district court's judgment and allowed the action to go forward. *See Bishop v. Air Line Pilots Ass'n, Int'l*, 900 F.3d 388 (7th Cir. 2018).

Following discovery, ALPA moved for summary judgment. It maintained that the plaintiffs had not come forward with evidence that its sole motive in adopting the retroactive pay provision was to discriminate against the pilot instructors. The district court agreed and granted ALPA's motion.

We now affirm. To establish a violation of the duty of fair representation under the circumstances presented here, the plaintiffs were required to come forward with evidence from which a jury could conclude that ALPA's sole motive in adopting the retroactive pay provision was an illicit one. The plaintiffs did not meet that burden; consequently, the district court correctly entered summary judgment on behalf of ALPA.

# I

## BACKGROUND

We presume familiarity with our prior opinion and recount here only those facts critical to our analysis.

## A.[1]

---

[1]Many background facts are not disputed, and we borrow generously from the district court's recitation of those facts in its summary judgment order. *See* R.375.

"Most United pilots are 'line pilots,' who … fly[] passengers from one location to another. Pilot instructors, by contrast, train other pilots and work in a single location at United's training center in Denver," Colorado.[2] There are just over 100 pilot instructors, a "small fraction of all United pilots."[3] Although pilot instructors may return to line pilot positions whenever they wish, the reverse is not the case; line pilots must apply to become a pilot instructor.

ALPA represents *all* United pilots for the purpose of collective bargaining. In 2003, while United was in bankruptcy, United and ALPA negotiated a collective bargaining agreement ("2003 UPA") that imposed significant cuts in wages and benefits on United pilots. The parties began to negotiate a new agreement in 2010, when the 2003 UPA became amendable; United pilots continued to work under the 2003 UPA during the negotiations, a process that took nearly three years. While negotiations were ongoing, United merged with Continental Airlines. Because ALPA was the certified representative of pre-merger Continental pilots as well, it continued negotiations on behalf of both groups of pilots. In 2012, United and ALPA reached a new agreement ("2012 UPA").

"Under both the 2003 and 2012 UPAs, line pilots were paid by the hour, with each pilot assigned an hourly wage rate based on" (1) the type of aircraft flown ("fleet"); (2) the pilot's rank in that aircraft ("seat"); and (3) the length of the

---

[2] *Id.* at 3 (citations omitted).

[3] *Id.*

pilot's service with the airline ("longevity").[4] "Both UPAs set an hourly rate for each fleet-seat-longevity combination …[.] [L]ine pilots were paid at that rate for the number of hours they were credited," and several "work rules" governed the calculation of credit hours for line pilots.[5] For example, both the 2003 and 2012 UPAs established a minimum number of "pay credit" hours a line pilot would receive per month, and both accounted for various schedule changes in calculating the number of credit hours.

"Pilot instructors' compensation under the 2003 and 2012 UPAs was more akin to a salary,"[6] but that salary also depended in part on the fleet-seat-longevity schedule used for line pilots. "Under the 2003 UPA, pilot instructors were paid *as if* they were first officers in a 757/767 class aircraft, with six years of longevity," who worked eighty-nine hours per month.[7] "Under the 2012 UPA, pilot instructors are paid *as if* they were first officers in a 777/787 class aircraft, with nine years of longevity," who work ninety hours per month.[8] Due to the increased pay cap, pilot instructors received "by far

---

[4] *Id.*

[5] *Id.* at 3–4.

[6] *Id.* at 5.

[7] *Id.*

[8] *Id.*

the largest percentage pay increase in the 2012 UPA" compared to other United pilots.[9]

The pilots had hoped that, in addition to other favorable terms, ALPA would be able to secure approximately $1 billion in retroactive pay for the three years during which negotiations were taking place. ALPA, however, was able to negotiate only $400 million for retroactive pay, $225 million of which was allocated to pre-merger United pilots.[10] This was significantly less than what was necessary to provide United pilots retroactive pay according to the newly adopted pay schedules. Consequently, the United Master Executive Council ("MEC"), the United pilots' elected leadership, assigned to one of its subcommittees, Subcommittee 2, the task of developing a formula for allocating the $225 million.

Subcommittee 2 had five members: Robert Fox, a line pilot and subcommittee chair; Mark Arellano, a pilot instructor; Steve Lynch, a line pilot; and two other line pilots. Arellano "served as the elected representative of pilot instructors' interests within ALPA during negotiations over the 2012 UPA and the retroactive pay formula. Another pilot instructor, Thomas Brinton, participated in Subcommittee 2's deliberations as a non-voting member."[11]

---

[9] *Id.*

[10] Pilots generally were dissatisfied with the total amount of retroactive pay that ALPA secured, and several voiced their discontentment to ALPA.

[11] R.375 at 6 (citations omitted).

Subcommittee 2 ultimately proposed a retroactive pay formula based on the combination of the 2003 UPA and the hourly rates set forth in the Delta pilots' 2010 collective bargaining agreement ("2010 Delta CBA"). The 2010 Delta CBA was used because Delta and United were competitors that had both gone through bankruptcy; consequently, Delta's hourly rates from 2010 through 2012 provided an appropriate benchmark for determining United pilots' pay rates during the time negotiations were ongoing. Subcommittee 2's proposal was simple: for purposes of calculating retroactive pay for an individual pilot, it would employ the terms of the 2003 UPA, but substitute the 2010 Delta CBA hourly rates. Thus, pilot instructors' retroactive pay was determined according to the 2003 UPA's pay cap—a first officer on a 757/767 with six years' longevity—but with the 2010 Delta CBA hourly rate attendant to that fleet-seat-longevity combination.

In general, the pilot instructors were dissatisfied with the retroactive pay formula because, they believed, it substantially disadvantaged pilot instructors compared to line pilots.[12] Indeed, Arellano, the pilot instructor representative on Subcommittee 2, initially had advocated for a different allo-

---

[12] According to the pilot instructors, they would have received a larger share of the $225 million had the 2010 Delta CBA's non-hourly rate pay provision for pilot instructors, rather than the 2003 UPA's pay cap, been used to calculate their retroactive pay. Although ALPA disputes the exact figures, the pilot instructors maintain that the adopted formula resulted in the line pilots receiving thirty-eight percent of their actual retroactive pay whereas pilot instructors received approximately fifteen percent of their actual retroactive pay.

cation formula for pilot instructors that used the increased pay cap in the 2012 UPA as a basis. Arellano explained to Subcommittee 2 that, because pilot instructor pay is tied so closely to the pay cap, "using the 2003 UPA pay cap would not accurately represent the pilot instructors' retro pay."[13] Subcommittee 2's discussions on the formula apparently were heated at times. Arellano told John Barton, a line pilot and MEC member, that one Subcommittee 2 member, John Lynch, had made comments during committee meetings "to the effect that pilot instructors should get less in retro pay because they were 'not real pilots' and made a lot of money for 'working at home.'"[14]

Nevertheless, Arellano ultimately spoke in favor of and voted for Subcommittee 2's proposal because "it would stand the test of time" and prevent "lawsuits."[15] In a recorded telephone call with a fellow pilot instructor, as well as in his later deposition testimony, Arellano explained that Subcommittee 2 was trying to achieve a formula that was "as simple as possible,"[16] and that the "whole point" was to have an allocation that was "simplistic and fair and equitable without disparate treatment."[17] Overall, Arellano be-

---

[13] R.359-1 at 17 (Arellano Dep. 169).

[14] R.353-1 at 99 (Barton Decl. ¶ 4).

[15] R.359-1 at 5 (Arellano Dep. 17).

[16] R.353-1 at 26 (Recorded Conversation at 3); *see also id.* at 27, 39, 62 (Recorded Conversation at 4, 16, 39).

[17] R.359-1 at 4 (Arellano Dep. 12).

lieved that the combination of the 2012 UPA and the retroactive pay formula "was a great and fantastic agreement for the [pilot] instructors."[18]

After "[t]he MEC reviewed and approved Subcommittee 2's proposal, … ALPA's membership ratified the formula alongside the 2012 UPA."[19] "Most of the United pilot instructors challenged the retroactive pay allocation formula through ALPA's dispute resolution process. The ALPA Executive Council—a central governing body with representatives from all ALPA-represented carriers—rejected the challenges,"[20] and the pilot instructors appealed to an arbitrator.

During the arbitration, Subcommittee 2 Chairman Fox testified accordingly about the development of the retroactive pay formula:

> Q. Okay. And how did your committee decide—what did your committee decide to do regarding the pilot instructors?
>
> A. The committee, like I said before, had—Mark Arellano was part of the committee. …
>
> Mark was an intimate member of the committee and explained exactly how pilot instructors get paid. And so I believe we relied heavily on Mark's advice.

---

[18] *Id.* at 6 (Arellano Dep. 19).

[19] R.375 at 8.

[20] *Id.* at 8–9 (citations omitted).

Q. And did he make any proposals himself about how instructors should be treated?

A. Yes. In explaining the process on what the language says in the collective bargaining agreement, the pilot instructors accept the job as a pilot instructor and they get paid based on their longevity up to a point; and then they're capped.

And once they hit the cap, they're basically paid for six-year 767/57 first officer pay rate.

Q. And was this a proposal from Mr. Mark Arellano?

A. Yes.[21]

At the arbitration, counsel for the pilot instructors cross-examined Fox at length, but did not specifically inquire regarding Arellano's involvement in creating the formula. In his deposition in this litigation, Fox clarified that the proposal did not originate with Arellano, but that Arellano "at the end of the day … agreed to use this [methodology]."[22] The arbitrator rejected the pilot instructors' claim.

**B.**

The pilot instructors filed this action alleging that ALPA breached its duty of fair representation under the Railway Labor Act because it adopted the retroactive pay formula for

---

[21] R.354-1 at 149 (Arbitration Tr. 59–60).

[22] R.349-2 at 14 (Fox Dep. 117).

the purpose of benefitting line pilots at the expense of pilot instructors. Specifically, the pilot instructors alleged that ALPA breached that duty "by discriminating against, expressing hostility and acting with animosity towards [the pilot instructors] and arbitrarily choosing to disregard their interests in favor of the interests of the stronger, more politically favored majority ... in its misallocation of the retro pay."[23] ALPA moved to dismiss the complaint, and the district court granted ALPA's motion. *See Barnes v. Air Line Pilots Ass'n, Int'l*, 141 F. Supp. 3d 836 (N.D. Ill. 2015). We reversed that judgment on appeal. *See Bishop*, 900 F.3d 388.

On remand, the district court granted the plaintiffs' motion for class certification,[24] the parties conducted discovery, and ALPA moved for summary judgment. In its motion, ALPA argued that, to establish a violation of the duty of fair representation, it was not enough for the pilot instructors to show that "the lump sum benefitted some pilots (or subgroup(s) of pilots) more than others."[25] Instead, the pilot instructors had to show that ALPA had made the decision "*solely* for the benefit of a stronger, more politically favored group over a minority group."[26] However, ALPA continued,

---

[23] R.29 ¶ 79.

[24] The district court defined the class as "[a]ll United pilots who, during any part of the period from January 1, 2010, and through December 18, 2012, worked as a United pilot instructor." R.311.

[25] R.347 at 22.

[26] *Id.* (quoting *Bishop v. Air Line Pilots Ass'n, Int'l*, 900 F.3d 388, 399 (7th Cir. 2018)).

the pilot instructors could not meet that burden. According to ALPA, "the allocation rationally applied the same rule to all United pilots" in that it employed the hourly rate set forth in the 2010 Delta CBA, but employed all other provisions of the 2003 UPA.[27] Additionally, it continued, there was "no evidence" of illicit animus because "Arellano confirmed that neither line pilots in Subcommittee 2 nor the United MEC manifested any hostility towards pilot instructors or a desire to benefit line pilots at their expense."[28]

ALPA maintained that, in addition to not being able to establish an improper motive, the pilot instructors also could not establish causation. Specifically, plaintiffs could not show that "but for ALPA's alleged animus, the union would have adopted another allocation method that would have benefitted them."[29] Because there was no evidence that ALPA would have adopted any of the methodologies that the pilot instructors had proposed, any alleged harm that they suffered was merely "speculative."[30]

The plaintiffs opposed the motion. They claimed that Subcommittee 2's retroactive pay formula was not even-handed because "the 'rule' that was supposedly applied 'uniformly' was based solely on the hourly rates under the Delta contract, the only component of a line pilot's pay,"

---

[27] *Id.* at 23 (capitalization removed).

[28] *Id.*

[29] *Id.* at 32.

[30] *Id.* at 32–33.

but pilot instructors were paid a salary.[31] Moreover, the pilot instructors continued, the formula resulted in a "gross disparity—38% v. 15%—in the distribution of retro pay."[32] Additionally, Subcommittee 2 knew that its approach "would result in inequitable treatment" and had intended such a result.[33] The plaintiffs pointed to the alleged statements by Subcommittee 2 members to the effect that pilot instructors should get less in retroactive pay because they are "not real pilots" and make a lot of money for "working at home."[34]

Finally, the pilot instructors claimed that ALPA's argument regarding causation was "nonsensical":

> The evidence shows that Subcommittee 2 deliberately sought to reduce the pilot instructors' retro pay and accomplished that task by refusing to account for the most significant component of their pay raise, the increase to their pay cap, in calculating their retro pay despite being warned of the inequities that would result. That decision *caused* a drastic reduction—$ 6.2 Million—to pilot instructors' retro pay.[35]

---

[31] R.355 at 18.

[32] *Id.* at 19.

[33] *Id.* at 20.

[34] *See* R.353-1 at 99 (Barton Decl. ¶ 4).

[35] R.355 at 30.

No. 21-1034                                                                    13

The district court granted ALPA's motion. First, it explained that ALPA's assessment of the disparity in retroactive pay was not supported by the record. Turning to ALPA's intent, the court noted that at least some of the evidence on which the plaintiffs relied was inadmissible. As for the formula the subcommittee adopted, the evidence established that Subcommittee 2 was looking for something "simple," without any "funky rules," that would be easy to explain and defend.[36] Given that the plaintiffs had to show that the retroactive pay provision had been adopted "*solely for the benefit of a stronger, more politically favored group over a minority group*," "ALPA [wa]s entitled to summary judgment."[37] The court explained:

> True enough, the summary judgment record, viewed in the light most favorable to Plaintiffs, could be read to support the proposition that ALPA's adoption of the [retroactive pay] formula was motivated *in part* by animus toward the pilot instructor minority. …
>
> …[T]he record indisputably shows that A[LP]A also had a nondiscriminatory, good faith justification for adopting the … formula: the desire for a simple, facially neutral rule that would be understood as equitable by ALPA's entire membership.[38]

---

[36] *See* R.375 at 18 (internal quotation marks omitted); *see also id.* at 18–21.

[37] *Id.* at 26, 28 (internal quotation marks omitted).

[38] *Id.* at 28–29.

Finally, the district court observed that granting summary judgment was not inconsistent with our prior decision. The district court noted that, in holding that the pilot instructors' complaint should not have been dismissed, we had

> highlighted the complaint's allegations "that pilot instructors make up a minority of ALPA's membership and that ALPA acted with the intent to appease its majority membership, the line pilots, after a lengthy and contentious CBA negotiation." Drawing reasonable inferences in Plaintiffs' favor, the complaint alleged that this was the sole reason ALPA adopted the [retroactive pay] formula.

> The summary judgment record, however, shows that ALPA had—either instead of or in addition to a discriminatory motive—a neutral, permissible motive for adopting the formula. That defeats Plaintiffs' duty of fair representation claim under the governing standard.[39]

The pilot instructors timely appealed.

## II

## DISCUSSION

### A.

We review the district court's grant of summary judgment de novo. *See, e.g.*, *Johnson v. Rimmer*, 936 F.3d 695, 705

---

[39] *Id.* at 33–34 (quoting *Bishop*, 900 F.3d at 399) (citations omitted).

(7th Cir. 2019). "Summary judgment is appropriate when, construing the record in the light most favorable to the nonmoving party, there is no genuine issue as to any material fact and the moving party is entitled to judgment as a matter of law." *United States v. Luce*, 873 F.3d 999, 1005 (7th Cir. 2017) (citations omitted). In conducting our review, we "may not make credibility determinations, weigh the evidence, or decide which inferences to draw from the facts; these are jobs for a factfinder." *Johnson*, 936 F.3d at 705–06 (quoting *Payne v. Pauley*, 337 F.3d 767, 770 (7th Cir. 2003)). "However, we are 'not required to draw every conceivable inference from the record' in favor of the nonmoving party, but 'only those inferences that are reasonable.'" *Luce*, 873 F.3d at 1005 (quoting *Schwartz v. State Farm Mut. Auto. Ins. Co.*, 174 F.3d 875, 878 (7th Cir. 1999)). We also need not consider "inferences 'that are supported by only speculation or conjecture,'" which cannot defeat summary judgment. *Carmody v. Bd. of Trs. of Univ. of Ill.*, 893 F.3d 397, 401 (7th Cir. 2018) (quoting *Design Basics, LLC v. Lexington Homes, Inc.*, 858 F.3d 1093, 1099 (7th Cir. 2017)).

**B.**

Our task here is to determine whether the district court properly granted summary judgment in favor of ALPA on the plaintiffs' duty of fair representation claim. The principles for determining whether a union has breached its duty of fair representation are set forth in our initial opinion. As we stated there, "[a] union breaches the duty of fair representation" only "if its actions are (1) arbitrary, (2) discriminatory, or (3) made in bad faith." *Bishop*, 900 F.3d at 397 (citing *Air Line Pilots Ass'n, Int'l v. O'Neill*, 499 U.S. 65, 67 (1991)). A plaintiff may succeed on a duty of fair representation by es-

tablishing any of these three bases. *See id.* Thus, "[i]n order to successfully defend against a motion for summary judgment on a duty of fair representation claim, the plaintiff must point the court to record evidence supporting any one or all of these elements." *Griffin v. Air Line Pilots Ass'n, Int'l,* 32 F.3d 1079, 1083 (7th Cir. 1994).

The arbitrary prong of the fair representation test is "very deferential." *Id.* In determining whether a union's action is arbitrary, "we employ 'an objective inquiry.'" *Bishop,* 900 F.3d at 397 (quoting *Rupcich v. United Food & Com. Workers Int'l Union,* 833 F.3d 847, 854 (7th Cir. 2016)). A union breaches the duty of fair representation under the "arbitrary prong" if the product of its bargaining efforts can "be fairly characterized as so far outside a 'wide range of reasonableness' that it is wholly 'irrational.'" *O'Neill,* 499 U.S. at 78 (quoting *Ford Motor Co. v. Huffman,* 345 U.S. 330, 338 (1953)). However, "[a] union's reasoned decision to support the interests of one group of employees over the competing interests of another group does not constitute arbitrary conduct." *Spellacy v. Airline Pilots Ass'n-Int'l,* 156 F.3d 120, 129 (2d Cir. 1998).

"Whether or not a union's actions are discriminatory or in bad faith calls for a subjective inquiry and requires proof that the union acted (or failed to act) due to an improper motive." *Neal v. Newspaper Holdings, Inc.,* 349 F.3d 363, 369 (7th Cir. 2003). This inquiry must be undertaken with the understanding "that unions often must make decisions that distinguish among different categories of employees." *Bishop,* 900 F.3d at 398. Thus,

> a claim of discrimination or bad faith must rest
> on more than a showing that a union's actions

treat different groups of employees differently. A union member's claim must be based on more than the discriminatory *impact* of the union's otherwise rational decision to compromise. Instead, a claim of discrimination "requires proof that the union acted (or failed to act) due to an *improper motive*."

*Id.* (quoting *Neal*, 349 F.3d at 369) (citation omitted).

To breach the duty of fair representation, discriminatory conduct must be "intentional, severe, and unrelated to legitimate union objectives." *Amalgamated Ass'n of Street, Elec. Ry. & Motor Coach Emps. of Am. v. Lockridge*, 403 U.S. 274, 301 (1971); *see also Merritt v. Int'l Ass'n of Machinists & Aerospace Workers*, 613 F.3d 609, 619 (6th Cir. 2010) (relying on same). "Whether a bargaining representative has acted fairly, impartially, and without hostile discrimination depends on the facts of each case." *Merritt*, 613 F.3d at 621.

"The mere fact that plaintiffs [are] a minority group within their union organization and that they were adversely affected by the actions of the union [does] not establish that the union acted with hostile or discriminatory intent." *Id.* (quoting *Ratkosky v. United Transp. Union*, 843 F.2d 869, 878–79 (6th Cir. 1988)). Moreover, tension or competition between different union constituencies does not evidence an improper motive. As one of our sister circuits has explained,

> [r]ank and file members of a labor union invariably have conflicting interests and thus form multiple, and at times competing, constituencies. Concessions and compromises are inevitable by-products of the bargaining process

and any single bargaining decision may inure
to the benefit of some members while poten-
tially injuring others. Thus, union negotiators
often find their members divided over the rela-
tive merits of the components of a settlement
agreement.

*Considine v. Newspaper Agency Corp.*, 43 F.3d 1349, 1357 (10th
Cir. 1994).

Instead, a union's motive is improper if it is "obviously
irrelevant and invidious." *Steele v. Louisville & N.R. Co.*, 323
U.S. 192, 203 (1944). Thus, by way of example, a union may
not make distinctions on the basis of race, *see id.*, or sex, *see
Carter v. United Food & Com. Workers, Local No. 789*, 963 F.2d
1078, 1082 (8th Cir. 1992).

A union acts in "bad faith" when "it acts with an im-
proper intent, purpose, or motive" "encompass[ing] fraud,
dishonesty, and other intentionally misleading conduct."
*Spellacy*, 156 F.3d at 126 (citing *Baxter v. United Paperworkers
Int'l Union, Local 7370*, 140 F.3d 745, 747 (8th Cir. 1998)).
"'Deceptive actions' or 'fraud' can be relevant to whether a
union acted in bad faith." *Bishop*, 900 F.3d at 398 (quoting
*Yeftich v. Navistar, Inc.*, 722 F.3d 911, 916 (7th Cir. 2013)). "We
have said that '[a] union would act in bad faith if, for exam-
ple, it disfavored members who supported a losing candi-
date for union office,'" *id.* (quoting *Cunningham v. Air Line
Pilots Ass'n Int'l*, 769 F.3d 539, 542 (7th Cir. 2014)), or if it
made decisions "*solely* for the benefit of a stronger, more po-
litically favored group over a minority group," *Barton
Brands, Ltd. v. NLRB*, 529 F.2d 793, 798–99 (7th Cir. 1976).

No. 21-1034                                                    19

With these principles in mind, we turn to the evidence that the plaintiffs proffered in response to ALPA's motion for summary judgment.

## C.

Before us, the plaintiffs maintain that "there is a disputed question of fact as to whether ALPA acted arbitrarily, discriminat[orily], or in bad faith when it excluded from the calculation of retro pay the most significant component of pilot instructors' pay raises under the new collective bargaining agreement."[40] More specifically, they maintain that the evidence supports a finding that ALPA's *sole motive* in adopting the retroactive pay formula was to benefit a larger and stronger portion of ALPA's membership at the expense of the pilot instructors. According to the plaintiffs, the critical evidence in support of this claim is: (1) the large disparity between the percentage of retroactive pay received by line pilots compared to pilot instructors; (2) "members of the subcommittee tasked with allocating retro pay harbored animosity toward pilot instructors and, therefore thought they should get less in retro pay"; and (3) the chairman of the same "subcommittee lied and claimed that [the committee] adopted a formula proposed and advocated for by the pilot instructor[]" representative on the subcommittee.[41] We conclude that this evidence, taken individually and collectively, does not raise a genuine issue of material fact as to whether ALPA acted arbitrarily, discriminatorily, or in bad faith.

---

[40] Appellant's Br. 21.

[41] *Id.*

**1.**

The plaintiffs assert that they have raised a genuine issue of fact that Subcommittee 2 knew both that its retroactive pay formula was not uniform and that the retroactive pay provision had a disparate impact on pilot instructors.[42] However, as we and other circuits have made clear, that some contractual provisions may inure to the benefit of a discrete segment of the bargaining unit does not mean that the provision discriminates against other members of the bargaining unit or that it was adopted in bad faith. "[A] claim of discrimination or bad faith must rest on more than a showing that a union's actions treat different groups of employees differently." *Bishop*, 900 F.3d at 398; *see also Considine*, 43 F.3d at 1357 ("Concessions and compromises are inevitable by-products of the bargaining process and any single bargaining decision may inure to the benefit of some members while potentially injuring others.").

Moreover, the retroactive pay formula must be placed in the greater context of negotiations for the 2012 UPA. *See Merritt*, 613 F.3d at 621 (noting that whether a bargaining agent "has acted fairly, impartially, and without hostile discrimination depends on the facts of each case"). It is undisputed that, under the 2012 UPA, pilot instructors received the largest pay raise of any subgroup of pilots. It is impossible to evaluate ALPA's subjective intent toward the pilot instructors without considering the broader context of the 2012

---

[42] *See id.* at 27–30.

No. 21-1034                                                        21

UPA negotiations, which, according to Arellano, resulted in "a great and fantastic agreement for the [pilot] instructors."[43]

In sum, the fact that ALPA's retroactive pay formula may have impacted pilot instructors more negatively than line pilots—and that Subcommittee 2 knew of that negative impact when it adopted the retroactive pay provision—does not raise a genuine issue of material fact.

**2.**

Turning to evidence of illicit motive, the pilot instructors rely primarily on the declaration of John Barton, a member of the United MEC during the time that the retroactive pay issue was being considered. According to Barton's declaration, Arellano told Barton that members of Subcommittee 2 stated that pilot instructors should get less in retroactive pay because they were "not real pilots," they received the largest raises under the 2012 UPA, and they made a lot of money "working at home."[44] The pilot instructors maintain that, having produced evidence that members of the committee had an illicit motive, the question of whether the illicit motive was Subcommittee 2's *sole motivation* must go to the jury. We disagree.

In his declaration, Barton states that he and Arellano spoke frequently about the deliberations of Subcommittee 2. Barton also describes some of those conversations:

---

[43] R.359-1 at 6 (Arellano Dep. 19).

[44] R.353-1 at 99–100 (Barton Decl. ¶¶ 4, 5).

4) Among other things, Arellano told me that during Subcommittee 2 meetings comments were made to the effect that pilot instructors should get less in retro pay because they were "not real pilots" and made a lot of money "working at home." According to Arellano, Steve Lynch, an ALPA Captain representative based in Chicago, was one of the members of Subcommittee 2 who made these comments.

5) Arellano also told me that the other members of Subcommittee 2 were all trying to cut TK [*i.e.*, pilot instructors] out of retro pay because they received one of the biggest raises and were going to make a lot of money under the new contract. Arellano told me that with pilot instructors getting that much money under the new contract there was no way they would be getting their share of retro pay. Arellano told Barton he did not agree with this, but that was the sentiments of Subcommittee 2.[45]

### a.

As an initial matter, we must decide the admissibility of the statements contained in paragraph five of Barton's declaration. In the district court, ALPA objected to this portion of the declaration on the ground that "Arellano's personal view of the mental states or motivations of other individuals is

---

[45] *Id.*

inadmissible."[46] The district court agreed and did not consider that paragraph of the declaration in disposing of ALPA's summary judgment motion.

The pilot instructors now maintain that the district court should have considered this evidence. The district court's determination, however, was not an abuse of discretion. *See Yancick v. Hanna Steel Corp.*, 653 F.3d 532, 547 (7th Cir. 2011). "Rule 701 of the Federal Rules of Evidence allows lay testimony of mental state as long as it is (a) rationally based on the perception of the witness; (b) helpful to a clear understanding of the witness' testimony or the determination of a fact in issue; and (c) not based on scientific, technical, or other specialized knowledge." *Id.* Moreover, the proffering party has to establish the factual basis for the witness's perception. *See id.* Barton's declaration does not satisfy this foundational requirement; it is silent on what Arellano perceived that may have led him to reach his conclusions concerning the motivations of "other members of Subcommittee 2."[47] The district court therefore did not abuse its discretion in refusing to consider the allegations in paragraph 5.

### b.

The plaintiffs, therefore, are left with the statement of one subcommittee member, Lynch, who stated that pilot instructors should get less in retroactive pay because they were

---

[46] R.357 at 13 n.13 (citing *Butt v. Bd. of Trs. of E. Ill. Univ.*, 83 F. Supp. 2d 962, 973 (C.D. Ill. 1999)).

[47] The declaration also is silent on which members' actions provided the basis for Arellano's conclusions.

"not real pilots" and made a lot of money "working at home." As we noted in *Barton Brands*, 529 F.2d at 798, it is not necessarily appropriate to look at a single officer's conduct to determine the reasons that the union acted because the individual officer's "motivations are not always the same as the motivations of the union as a whole." *See also Spellacy*, 156 F.3d at 129–30 (concluding that "the statement of a single MEC executive" could not establish "that ALPA's actions arose from prejudice against the original Pan Am pilots"). As we already have noted, "[r]ank and file members of a labor union invariably have conflicting interests and thus form multiple, and at times competing, constituencies." *Considine*, 43 F.3d at 1357. Consequently, statements by negotiators that are critical of a particular contingent of constituents often will not be sufficient to establish an illicit motivation.[48] That certainly is the case here, where there is undisputed evidence that at least one of the committee's motivations in choosing the retroactive pay formula was that it was simple, straightforward, and defensible. As the district court noted, Arellano, the representative of pilot instructors on Subcom-

---

[48] *See Griffin v. Air Line Pilots Ass'n, Int'l*, 32 F.3d 1079, 1083 (7th Cir. 1994) (explaining that "statements by highly-placed union officials expressing distaste for pilots who did not join the union should surprise nobody" and, in that factual context, "[could ]not support the inference that the union leaders targeted the pilots who were not union members"); *cf. Merritt v. Int'l Ass'n of Machinists & Aerospace Workers*, 613 F.3d 609, 622 (6th Cir. 2010) (explaining that negotiator's comments that a group of constituents was "a bunch of 'whiners,' … were 'a lot of trouble,' and that he would 'like to give them back'" "fail[ed] to support allegations of intentional and severe discriminatory conduct sufficient to support a claim for breach of duty of fair representation").

mittee 2, "was consistent on th[e] score" that the subcommittee wanted to adopt a formula that was easy to explain and not subject to criticism that there were "'funky rules'" for different subsets of pilots.[49] Other members of Subcommittee 2 as well testified to trying to achieve a "transparent" and "simpl[e]" allocation.[50] When the record contains undisputed evidence that the subcommittee members adopted a measure for a legitimate purpose, the sole motivation standard has not been met.

### 3.

Finally, the pilot instructors point to evidence that ALPA "lied about the reason it adopted the retro pay allocation methodology."[51] They note that, in his testimony at the arbi-

---

[49] *See* R.375 at 29–31 (collecting excerpts of Arellano's recorded conversation and deposition testimony).

The pilot instructors submit that their situation is akin to that in *Mansfield v. Air Line Pilots Association, International*, No. 06-cv-6869, 2009 WL 2386281 (N.D. Ill. July 29, 2009). In that case, the pilots submitted evidence that, "[i]f proven at trial, … would allow a reasonable jury to find that the MEC had engaged in an elaborate show of soliciting expert advice and pilot opinion on the fairness" of a proposal when the MEC already had decided against a proposal that "would have placed all but two of the MEC members in a financially worse position." *Id*. at *3. There is no evidence here of the kind of sham or ruse described in *Mansfield*.

[50] *See* R.349-1 at 8 (Briton Dep. 50) (describing the difficulties that could arise if there were not a straightforward calculation for retroactive pay); *see also* R.349-2 at 16 (Fox Dep. 132) (explaining that the committee "tried to come up with a fair and equitable distribution method").

[51] Appellant's Br. 37.

No. 21-1034

tration, Fox stated that Subcommittee 2 "relied heavily on
[Arellano's] advice" and that Arellano had proposed the
methodology that the subcommittee eventually adopted.[52]
However, the pilot instructors continue, they have "present-
ed evidence that ALPA's justification was a lie because Arel-
lano denied proposing the formula and actually advocated
against it."[53] "The only logical conclusion that can be drawn
from these facts," the plaintiffs submit, "is that the ALPA
subcommittee intentionally and knowingly adopted an allo-
cation formula that 'cut out' pilot instructors from their fair
share of retro pay and lied about the reasons for doing so."[54]

However, this specific misrepresentation is not evidence
that Subcommittee 2's *sole* motivation in adopting its retroac-
tive pay formula was discriminatory or in bad faith.[55] First,

---

[52] R.354-1 at 149 (Arbitration Tr. 59–60).

[53] Appellant's Br. 37.

[54] *Id.*

[55] The plaintiffs submit that, in the Title VII context, evidence of such a
misrepresentation is sufficient to get to a jury, and the same result
should obtain here. *See id.* at 39–40. We have less confidence that Title VII
tests and standards have direct application to the duty of fair representa-
tion. *See, e.g.*, *Addington v. US Airline Pilots Ass'n*, 791 F.3d 967, 983 (9th
Cir. 2015) (discussing some of the differences between Title VII and the
duty of fair representation). Nevertheless, assuming the applicability of
Title VII standards, we do not believe that Fox's testimony, standing
alone, would be sufficient to establish that Subcommittee 2's rationale for
adopting its retroactive pay formula was pretextual. In *Rudin v. Lincoln
Land Community College*, 420 F.3d 712 (7th Cir. 2005), on which the plain-
tiffs rely, *see* Appellants' Br. 39, we noted that, "in order to survive a mo-
tion for summary judgment, an employee need only produce evidence

(continued … )

No. 21-1034                                                    27

Fox's arbitration testimony was given after the 2012 UPA—
including the retroactive pay formula—was ratified. Thus,
this is not a situation where Fox's misrepresentation duped
union members into voting for a different measure or lulled
them into inaction. *Cf. Spellacy*, 156 F.3d at 128–29 (conclud-
ing that side deals and "subsequent misrepresentations de-
signed to cover … tracks" did not amount to bad faith where
misrepresentations were uncovered in time for the pilots to
challenge the policy). Moreover, the identity of the subcom-
mittee member who originally proposed the formula has lit-
tle bearing on the ultimate question here: the subcommittee's
motivation. Nothing about Fox's testimony calls into ques-
tion the undisputed testimony of the committee members as
to *why* the committee adopted its retroactive pay formula.

Here, the summary judgment record does not raise a
genuine issue of material fact that requires us to send the
plaintiffs' duty of fair representation claim to a jury.[56] ALPA

---

( … continued)

from which a rational factfinder could infer that the company lied about
its proffered reasons for [her] dismissal." *Rudin*, 420 F.3d at 726 (altera-
tion in original) (internal quotation marks omitted). Here, Fox did not lie
about Subcommittee 2's proffered reasons for adopting its retroactive
pay formula; he lied about who proposed the formula that it ultimately
adopted.

[56] The plaintiffs maintain that the critical evidence of bad faith, on which
they relied in opposing ALPA's motion to dismiss, has not changed. *See*
Reply Br. 7. They believe that, on the basis of these lingering facts,
ALPA's motion for summary judgment also should fail. However, at this
stage, we are evaluating the plaintiffs' evidence through a much differ-
ent lens. In the prior appeal, the plaintiffs only had to allege "enough
facts to state a claim to relief that is plausible on its face"—that is,
enough to "nudge[] their claim[] across the line from conceivable to

(continued … )

is the designated collective bargaining agent for all United pilots, but United pilots are not a monolithic group. They consist of "multiple, and at times competing, constituencies," *Considine*, 43 F.3d at 1357, one of which is the pilot instructors. The pilot instructors were on the winning end of the pay provisions of the 2012 UPA; when it came to the retroactive pay negotiations, their individual interests gave way to a broader concern for a single, simple, defensible approach. The fact that discussions about these issues were heated and that some pilot instructors were upset about the retroactive pay provision is simply a byproduct of the negotiation process.[57]

---

( … continued)

plausible." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007). Our review on summary judgment requires a different assessment. At this stage, the question is not whether the pilot instructors' allegations are plausible, but whether they have come forward with sufficient evidence from which a jury could conclude that ALPA's sole motivation in adopting the retroactive pay formula was illicit. In this case, the developed record has allowed us to place isolated statements in context and to piece together a far more complete picture of Subcommittee 2's considerations and motivations. The record before us simply does not supply sufficient evidence of a sole, illicit motive to allow the plaintiffs to proceed to a jury. Indeed, we anticipated this possibility in our prior opinion: "ALPA might well be able to prove later in the litigation that, as a factual matter, it did not act with the bad-faith motive that the plaintiffs have pleaded at this stage." *Bishop*, 900 F.3d at 400.

[57] Because we conclude that the plaintiffs have not come forward with evidence of a sole, illicit motive, it is not necessary for us to consider ALPA's alternative argument that the plaintiffs have not come forward with sufficient evidence of causation.

As the district court concluded, "the summary judgment record, viewed in the light most favorable to Plaintiffs, could be read to support the proposition that ALPA's adoption of the [retroactive pay] formula was motivated *in part* by animus toward the pilot instructor minority."[58] Nevertheless, as the plaintiffs conceded at oral argument, the operative standard is whether, taken in the light most favorable to the pilot instructors, the evidence establishes that ALPA was motivated *solely* by a desire to discriminate against pilot instructors in adopting the retroactive pay formula. Given the substantial and undisputed evidence in the record that Subcommittee 2 wanted a simple formula that could be easily defended, the plaintiffs have not met their burden.

## Conclusion

For the reasons set forth in this opinion, we affirm the judgment of the district court.

AFFIRMED

CERTIFIED COPY

A True Copy
Teste:

Deputy Clerk
of the United States
Court of Appeals for the
Seventh Circuit

---

[58] R.375 at 28–29.